CLOSED

# U.S. District Court
## Middle District of Florida (Orlando)
## CRIMINAL DOCKET FOR CASE #: 6:22−mj−01515−DAB−1

Case title: USA v. Watson

Other court case number: 4:22−cr−125−ALM−CAN Eastern
District of Texas

Date Filed: 05/31/2022

Date Terminated: 06/06/2022

---

Assigned to: Magistrate Judge
David A. Baker

**Defendant (1)**

| | | |
|---|---|---|
| **James Walker Watson, Jr.**<br>*TERMINATED: 06/06/2022* | represented by | **Blair Thomas Jackson**<br>The Law Office of Corey Cohen & Associates<br>21 Park Lake Street<br>Orlando, FL 32803<br>407−246−0066<br>Email: blair@coreycohen.com<br>*ATTORNEY TO BE NOTICED*<br>Designation: Retained |

| **Pending Counts** | **Disposition** |
|---|---|
| None | |

| **Highest Offense Level (Opening)** | |
|---|---|
| None | |

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

| **Highest Offense Level (Terminated)** | |
|---|---|
| None | |

| **Complaints** | **Disposition** |
|---|---|
| 18:1343.F FRAUD BY WIRE,<br>RADIO, OR TELEVISION | |

---

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **Courtney Richardson−Jones**<br>DOJ−USAO<br>Orlando Division<br>400 W Washington Street<br>Suite 3100<br>Orlando, FL 32801<br>407−648−7531<br>Email: courtney.richardson−jones@usdoj.gov<br>*ATTORNEY TO BE NOTICED*<br>Designation: Retained |

| Date Filed | # | Docket Text |
|---|---|---|

| 05/31/2022 | 1 | Arrest pursuant to Rule 5(c)(2) of James Walker Watson, Jr from the Eastern District of Texas. (Attachments: # 1 Indictment)(TNP) (Entered: 05/31/2022) |
|---|---|---|
| 05/31/2022 | 2 | Minute Entry for In Person proceedings held before Magistrate Judge David A. Baker: INITIAL APPEARANCE in Rule 32.1 proceedings held on 5/31/2022 as to James Walker Watson, Jr from the Eastern District of Texas. (Digital) (TNP) (Entered: 05/31/2022) |
| 05/31/2022 | 3 | WAIVER of Rule 5 & 5.1 Hearings hearing by James Walker Watson, Jr. Defendant has waived an identity hearing, preliminary hearing, and identity hearing. (TNP) (Entered: 05/31/2022) |
| 05/31/2022 | 4 | **ORDER OF TEMPORARY DETENTION as to James Walker Watson, Jr. Detention Hearing set for 6/3/2022 at 10:00 AM in Orlando Courtroom 6 D before Magistrate Judge David A. Baker. Signed by Magistrate Judge David A. Baker on 5/31/2022. (TNP)** (Entered: 05/31/2022) |
| 05/31/2022 | 5 | ***CJA 23 Financial Affidavit by James Walker Watson, Jr. (TNP) (Entered: 05/31/2022) |
| 05/31/2022 | 6 | Ore Tenus MOTION for Detention by USA as to James Walker Watson, Jr. (TNP) (Entered: 05/31/2022) |
| 06/03/2022 | 8 | Minute Entry for In Person proceedings held before Magistrate Judge David A. Baker: Detention Hearing as to James Walker Watson, Jr held on 6/3/2022. (Digital) (TNP) (Entered: 06/03/2022) |
| 06/03/2022 | 9 | **ORDER OF DETENTION PENDING TRIAL, granting 6 Ore Tenus Motion for Detention as to James Walker Watson Jr. (1). Signed by Magistrate Judge David A. Baker on 6/3/2022. (TNP)** (Entered: 06/03/2022) |
| 06/06/2022 | 10 | EXHIBIT LIST by USA as to James Walker Watson, Jr (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(TNP) (Entered: 06/06/2022) |
| 06/06/2022 | 11 | EXHIBIT LIST by James Walker Watson, Jr (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(TNP) (Entered: 06/06/2022) |
| 06/06/2022 | 12 | **ORDER OF REMOVAL pursuant to Rule 5(c)(3) to the Eastern District of Texas as to James Walker Watson, Jr. Signed by Magistrate Judge David A. Baker on 6/6/2022. (TNP)** (Entered: 06/06/2022) |
| 06/06/2022 | | NOTICE to Eastern District of Texas of a Rule 5 or Rule 32 Initial Appearance as to James Walker Watson, Jr regarding your case number: 4:22−cr−125−ALM−CAN. Using your PACER account, you may retrieve the docket sheet and any documents via the case number link. No documents/record will be sent. If you require certified copies of any documents please send a request to InterdistrictTransfer_FLMD@flmd.uscourts.gov. If you wish the court to use a different email address in the future, please send a request to update your address to InterdistrictTransfer_TXND@txnd.uscourts.gov. (TNP) (Entered: 06/06/2022) |

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                          **CASE NO: 6:22-mj-1515-DAB**

**JAMES WALKER WATSON, JR.**

_____

AUSA: Courtney Richardson-Jones

Defense Attorney: Blair Jackson, Retained Counsel

| JUDGE: | **DAVID A. BAKER**<br>United States Magistrate Judge | DATE AND TIME: | **May 31, 2022**<br>2:10 P.M. – 2:17 P.M. |
|---|---|---|---|
| Courtroom: | 6D | TOTAL TIME: | 7 minutes |
| DEPUTY CLERK: | T. Palmer | REPORTER: | Digital<br>Orlando_Digital_Transcripts@flmd.uscourts.gov |
| INTERPRETER: | None | PRETRIAL/PROB: | Sofia Kollaian |

### CLERK'S MINUTES
### INITIAL APPEARANCE
### (RULE 5C INDICTMENT)

Case called, appearances made, procedural setting by the Court.
Interpreter placed under oath.
Court advises defendant of his rights, including Rule 20 rights.
Defendant waives formal reading of Indictment.
Government advises defendant of the counts in the Indictment and potential penalties.
Defendant waives Rule 5 & 5.1 hearings. (Defendant waived identity hearing)
Government makes ore tenus motion for detention.
Government seeks a 3 day continuance for a detention hearing. Detention hearing set for Friday June 3rd, 2022 at 10am. Defendant is remanded to the US Marshal pending further proceedings. Order to enter.
Court advises government of the requirements pursuant to the Due Process Protections Act.
Court adjourned.

AO 466A  (Rev. 12/09) Waiver of Rule 5 & 5.1 Hearings (Complaint or Indictment)

# UNITED STATES DISTRICT COURT
## Middle District of Florida
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                    **CASE NO: 6:22-mj-1515-DAB**

**JAMES WALKER WATSON, JR.**

**Charging District's**
**Case No. 4:22-cr-128**

## WAIVER OF RULE 5 & 5.1 HEARINGS
## (Complaint or Indictment)

I, **James Walker Watson, Jr.**, understand that I have been charged in another district, the Eastern

District of Texas

I have been informed of the charges and of my rights to:

(1)   retain counsel or request the assignment of counsel if I am unable to retain counsel;
(2)   an identity hearing to determine whether I am the person named in the charges;
(3)   production of the warrant, a certified copy of the warrant, or a reliable electronic copy of either;
(4)   a preliminary hearing within 14 days of my first appearance if I am in custody and 21 days
       otherwise - unless I am indicted – to determine whether there is probable cause to believe that an
       offense has been committed;
(5)   a hearing on any motion by the government for detention;
(6)   request transfer of the proceedings to this district under Fed.R. Crim.P. 20, to plead guilty.

## I AGREE TO WAIVE MY RIGHT(s) TO:

☑    an identity hearing and production of the warrant

☑    a preliminary hearing

☐    a detention hearing

☑    an identity hearing, production of the warrant, and any preliminary or detention hearing to which
       I may be entitled in this district. I request that those hearings be held in the prosecuting district,
       at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the
charges are pending against me.

May 31, 2022

_____
Defendant's Signature

_____
Signature of defendant's attorney

_____
Printed name of defendant's attorney

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                              **CASE NO: 6:22-mj-1515-DAB**

**JAMES WALKER WATSON, JR.**

_____

## ORDER OF TEMPORARY DETENTION

A detention hearing in this case is scheduled as follows:

| **Place:** | George C. Young United States Courthouse and Federal Building. 401 W Central Boulevard Orlando, Florida | **Courtroom:** | 6D |
|---|---|---|---|
| | | **Date and Time:** | June 3, 2022, at 10:00 A.M. |

**IT IS ORDERED:** Pending the hearing, the defendant is to be detained in the custody of the United States marshal or any other authorized officer. The custodian must bring the defendant to the hearing at the time, date, and place set forth above.

Date: May 31, 2022

_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                    **CASE NO: 6:22-mj-1515-DAB**

**JAMES WALKER WATSON, JR.**

_____

AUSA: Courtney Richardson-Jones

Defense Attorney: Corey Cohen, Retained Counsel

| JUDGE: | **DAVID A. BAKER**<br>United States Magistrate Judge | DATE AND TIME: | **June 3, 2022**<br>10:13 A.M. – 10:45 A.M.<br>11:00 A.M. – 11:18 A.M. |
|---|---|---|---|
| Courtroom: | 6D | TOTAL TIME: | 50 minutes |
| DEPUTY CLERK: | T. Palmer | REPORTER: | Digital<br>Orlando_Digital_Transcripts@flmd.uscourts.gov |
| INTERPRETER: | None | PRETRIAL/PROB: | Ebonie Henderson-Larrame |

### CLERK'S MINUTES
### DETENTION HEARING

Case called, appearances made, procedural setting by the Court.
Government calls on FBI Special Agent, Benjamin Whitley. Witness placed under oath.
Government exhibits 1 and 2 admitted. Defense does not object.
Cross examination.
Testimony concluded.
Defense calls on Ann Marie Kuykendall, defendant's fiancée. Witness placed under oath.
Cross examination.
Testimony concluded.
Defense calls on John Griffin. Witness placed under oath.
Defense exhibits 1 through 4 admitted. Government does not object.
Cross examination.
Redirect.
Testimony concluded.
Court in recess (10:45 A.M)
Court resumes (11:00 A.M.)
Government calls on FBI Special Agent, Benjamin Whitley back to the stand.
Cross examination.

Counsel made arguments.
Matters taken under advisement.
Court in recess (11:18 A.M.)
Court adjourned.

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                              **CASE NO: 6:22-mj-1515-DAB**

**JAMES WALKER WATSON, JR.**

_____

# ORDER OF DETENTION PENDING TRIAL

## FINDINGS

In accordance with the Bail Reform Act, 18 U.S.C. § 3142(f), a detention hearing has been held.   The following facts and circumstances require the defendant to be detained pending trial. The government has presented clear and convincing evidence of threats by the Defendant against witnesses and alleged victims in this and prior cases. Some of these threats were physical and others appear intended to intimidate. Both represent a danger of obstruction of justice. In addition, the defendant, whose record shows a lifestyle of fraud and criminality, has repeatedly mislead supervising officers as to his whereabouts. Although defendant offered testimony from a potential third-party custodian, his community ties are slim, consisting primarily of another planned music event. Because of his history of using such events to carry out fraudulent schemes, this connection to Central Florida provides little or no comfort as regards his ties to the community. Accordingly, the Court concludes:

No condition or combination of conditions of release will reasonably assure the appearance of the defendant as required or the safety of any other person and the community.

This conclusion is based on the evidence adduced of the matters enumerated in 18 U.S.C. § 3142(g) as presented in open court at the detention hearing.

**DIRECTIONS REGARDING DETENTION**

James Walker Watson, Jr. is committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. James Walker Watson, Jr. shall be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a Court of the United States or on request of an attorney for the government, the person in charge of the corrections facility shall deliver the Defendant to the United States marshal for the purpose of an appearance in connection with a Court proceeding.


Date:   June 3, 2022


_David A. Baker_
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE



# EXHIBIT LIST

✓ Government ___ Plaintiff ___ Defendant ___ Court

**Case No.**
**Style:**

6 : 22 -mj -1515- DAB
United States of America
v. James Walker Watson, Jr.

| Exhibit No. | Date Identified | Date Admitted | Sponsoring Witnesses | Objections / Stipulated Admissions[1] | Description of Exhibit |
|---|---|---|---|---|---|
| 1 | 3 June 22 | 6/3/2022 | SA Ben Whitley | | Transcript of Detention Hearing (SDTX) |
| 2 | 3 June 22 | 6/3/2022 | SA Ben Whitley | | Order of Detention (Judge Smith) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

[1]Use a code (e.g. "A"or "*") in this column to identify exhibits to be received in evidence by agreement without objection. Otherwise, specifically state each objection to each opposed exhibit. Please note that each date box on the left must be one inch wide to accommodate the Clerk's date stamp.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | . | **CASE NO. H-10-CR-329** |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | FRIDAY, NOVEMBER 5, 2010 |
| **JAMES WATSON,** | . | 2:25 P.M. TO 3:48 P.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . . .

**DETENTION HEARING**

BEFORE THE HONORABLE STEPHEN SMITH
UNITED STATES MAGISTRATE JUDGE

**Trinity Transcription Services**
**61 North Bay Boulevard**
**The Woodlands, TX 77380**
**281-296-2290**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | . | **CASE NO. H-10-CR-329** |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | FRIDAY, NOVEMBER 5, 2010 |
| **JAMES WATSON,** | . | 2:25 P.M. TO 3:48 P.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . . . .

**DETENTION HEARING**

BEFORE THE HONORABLE STEPHEN SMITH
UNITED STATES MAGISTRATE JUDGE

Appearances:

For the Government:          Belinda Beek, Esq.
                             Assistant United States Attorney
                             P.O. Box 61129
                             Houston, TX 77208

For the Defendant:           Phi Gallagher, Esq.
                             Assistant Federal Public Defender
                             440 Louisiana
                             Houston, TX 77002

Case Manager:                Jason Marchand

Official Interpreter:        None Present

Court Recorder:              Suzanne Guevara

Transcriber:                 Cheryl Battaglia
                             Trinity Transcription Services
                             61 North Bay Boulevard
                             The Woodlands, TX 77380
                             281-296-2290

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

**INDEX**

WITNESSES:                          <u>Direct</u> <u>Cross</u> <u>Redirect</u> <u>Recross</u>

   James Hawkins

      By Ms. Beek                        2

      By Mr. Gallagher                         44


   Closing Argument

      By Ms. Beek                    56

      By Mr. Gallagher               60

   Ruling

      The Court                       64


EXHIBITS:                                           <u>Offered</u> <u>Received</u>

   For the Government

   G-1          Petition for Warrant or Summons
                   For Offender Under Supervision

   G-3          Letter to Marjorie Howell from
                   James Watson forwarding letter
                   From law firm regarding
                   Settlement

   G-4          Email from Jean Sanders to
                   James Watson at the Federal
                   Bureau of Prisons around
                   May 5, 2010

1

 1          **Houston, Texas; Friday, November 5, 2010; 2:25 p.m.**

 2              **THE COURT:**  Next case is *United States of America*

 3     *versus James Watson.   Criminal Case H-10-329.*

 4              **MS. BEEK:**  Belinda Beek for the United States, your

 5     Honor.

 6              **THE COURT:**  Good afternoon, Miss Beek.

 7              **MR. GALLAGHER:**  And Phil Gallagher for Mr. Watson,

 8     your Honor

 9              **THE COURT:**  Mr. Gallagher.

10              Are we ready to proceed with this hearing?

11              **MR. GALLAGHER:**  We are, your Honor.

12              **THE COURT:**  All right.  You can have a seat at

13     counsel table then and Government may call its first witness.

14              **MR. GALLAGHER:**  Great.  Thank you.  And, your Honor,

15     may Mr. Watson have his writing hand free to take notes during

16     the hearing?

17          **(Pause)**

18              **THE COURT:**  Yes.  I'll allow that.

19              **MR. GALLAGHER:**  Thank you, your Honor.

20              **MS. BEEK:**  United States calls Jim Hawkins -- James

21     Hawkins.

22              **THE COURT:**  Come forward, sir, and be sworn.

23              **THE WITNESS:**  Coming through.

24          **(Voices speaking off the record)**

25              **THE CLERK:**  Raise your right hand.

```
                          HAWKINS - DIRECT                      2

 1        (Witness sworn)

 2            THE COURT:  All right.  Have a seat, sir, in the

 3   witness box.

 4        (Pause)

 5            THE COURT:  All right.  You may proceed, Miss Beek.

 6            MS. BEEK:  Thank you, your Honor.

 7                         DIRECT EXAMINATION

 8   BY MS. BEEK:

 9   Q    Would you please state your name for the record?

10   A    James Hawkins.

11   Q    Where are you employed?

12   A    The FBI.

13   Q    How long have you been with the FBI?

14   A    Twenty years.

15   Q    Do you work in a particular section in the FBI?

16   A    Yes.  I investigate white collar crime.

17   Q    And how long have you done that?

18   A    Approximately 19 ½ years, about 20.

19   Q    Are you the case agent who is assigned to investigate

20   complaints received by the FBI relating to this Defendant,

21   James Watson, Junior?

22   A    Yes, I am.

23   Q    And do those complaints involve the -- Mr. Watson's

24   involvement with the Texas Music Festival that occurred here in

25   Houston about 2 years ago in 2008?
```

HAWKINS - DIRECT                                3

1   A    Yes.

2   Q    When, approximately during 2008, did the FBI start

3   receiving those complaints?

4   A    It was probably mid-September, 2008.  The Music Festival

5   took place over Labor Day weekend 2008.

6   Q    And --

7   A    And we started getting calls shortly thereafter.

8   Q    And what were the nature of the complaints?

9   A    Well I received a complaint from Bank of America about the

10  check kite that had occurred on the -- the accounts controlled

11  by the Texas Music Festival.  And we also received calls from

12  several people in the -- in the area that said they were

13  investors that had lost some money in the investment.

14  Q    Since the investigation started do you know an approximate

15  amount of money involved from the loss, and talking about

16  investors and to the bank, related to this activity by

17  Mr. Watson related to the music festival?

18  A    Yes.  It's approximately $3 million.

19  Q    And so far how many individual investors do we know about

20  who lost money?

21  A    It's approximately 20.

22       **(Pause)**

23  **BY MS. BEEK:**

24  Q    Did those complaints and the investigation ultimately

25  result in an indictment?

```
                       HAWKINS - DIRECT                      4

 1  A    Yes, it did.

 2  Q    When was that?

 3  A    May 19th, 2010.

 4  Q    Can you briefly summarize the indictment for the Court,

 5  including the charges in the indictment?

 6  A    Yes.  Mr. Watson was charged with bank fraud in relation

 7  to the check kite at Bank of America that involved

 8  approximately $400,000 check.  He was also charged with credit

 9  card fraud in the amount of approximately $16,000.

10  Q    Unauthorized use of a credit card?

11  A    Yes.

12  Q    On what --

13  A    Of an American Express credit card.

14  Q    Belonging to one of the investors?

15  A    Yes.

16  Q    And just briefly, for the check kite.

17  A    Actually, it involved -- the check kite involved a credit

18  card owned by one of the vendors, the food vendors for the

19  expo.

20  Q    I'm sorry.  The unauthorized use of the credit card.

21  A    Yes.

22  Q    Did the check kite involve two other individuals, and you

23  don't need to name them.

24  A    Yes, it did.

25  Q    Was one of them Mr. Watson's son and the other one a
```

```
                          HAWKINS - DIRECT                      5
```

1    girlfriend of Mr. Watson's at one time?

2    A    Yes.

3    Q    And have you spoken to both of those individuals during

4    the course of your investigation?

5    A    Yes, I have.

6         **(Pause)**

7    **BY MS. BEEK:**

8    Q    When these complaints started coming in, did you discover

9    that the Defendant was, at that time and before, for several

10   years, on federal supervised release after serving a prison

11   sentence in California for essentially the same activity

12   related to the Sacramento Jazz Festival in the Eastern District

13   of California?

14   A    Yes, that's true.

15   Q    And what was he convicted of relating to the Sacramento

16   Jazz Festival?

17   A    Bank fraud related to basically a check kite on three

18   checks.

19   Q    And was Mr. Watson's mother involved in the check kite

20   with -- that resulted in the Sacramento charge?

21   A    Yes.  They were her checks.

22   Q    Again, when I say involved, she was the person on the

23   check kite, not that she was charged or convicted; is that

24   correct?

25   A    That's correct.  Mr. Watson's mother was not charged in

```
                          HAWKINS - DIRECT                    6

 1    that -- that case.

 2    Q    When was the Defendant convicted of that crime related to

 3    the Sacramento Jazz Festival?

 4    A    I think that was the case revolved around the 2001 jazz

 5    festival.  And I think he was convicted in that during 2002.

 6    Q    Prior to beginning his prison sentence for that offense,

 7    had the Court in California granted pretrial release bond to

 8    Mr. Watson?

 9    A    Yes, it did.

10    Q    What happened with his pretrial release bond in that case?

11    A    The judge revoked the pretrial release bond because there

12    was a finding that Mr. Watson had lied to the pretrial officer

13    about his address.

14    Q    And later on we'll get into it in more detail, have you

15    spoken to the two probation officers with the United States

16    Probation Office in California, both in Sacramento and Los

17    Angeles, who supervised Mr. Watson while he was on supervised

18    release after completing his prison time for that Sacramento

19    offense?

20    A    Yes, I did.

21    Q    And they also said that Mr. Watson lied about his

22    whereabouts for years, or specifically about his residence

23    while he was on supervised release in California.

24    A    Yes, they did.

25    Q    Where did they believe he lived when he was on supervised
```

HAWKINS - DIRECT                    7

1   release?

2   A    They believed he lived in Los Angeles.

3        This case was from -- was out of the Sacramento

4   District.  And it was transferred to a probation officer in Los

5   Angeles, because of the -- because of the -- their belief that

6   he lived there.

7        The address actually was his mother's address in Los

8   Angeles.

9   Q    Did the probation officers also tell us and produce

10  information that Mr. Watson had also lied about his income, his

11  assets, his activities, and the fact that he was committing new

12  offenses while he was on supervised release.

13  A    Yes.  That's what they said.

14  Q    When he was on supervised release, had the Federal Judge

15  in the Eastern District of California imposed a special

16  condition on Mr. Watson while he was on supervised release

17  related to him engaging in entertainment-related activities,

18  fund raising, rodeos, music festivals and those kinds of

19  things?

20  A    Yes.  The Judge said he could not participate in any sort

21  of musical festivals, or events, or fundraising.

22  Q    Directly or indirectly.

23  A    Yes.

24  Q    Does the Defendant have a criminal history?

25  A    Yes.  He has an extensive criminal history.

```
                          HAWKINS - DIRECT                    8

 1    Q    Does it date back to 1970's?

 2    A    It begins in 1974.

 3    Q    And does is include numerous fraud and theft convictions?

 4    A    Yes.  Approximately 17 arrests, burglary, grand theft

 5   auto.  There's several of those.  Bad checks, several of those.

 6   Receiving stolen property.  There's also the bank fraud case we

 7   were talking about, as well as an elder abuse case that

 8   occurred just a few years ago.

 9    Q    Is there a history of parole violations or non-

10   appearances?

11    A    Yes.

12    Q    Would you tell the Court about those?

13    A    Yes.  On his criminal history, there's several times where

14   there's -- his probation has been revoked.  There's also

15   mention of violation of parole.  And was one mention of

16   fugitive status.

17          (Pause)

18   BY MS. BEEK:

19    Q    Did the special conditions imposed by Judge Shubb,

20   S-h-u-b-b, in the Eastern District of California, also prohibit

21   the Defendant from having a checking account?

22    A    Yes, it did.  I believe he is allowed to have a savings

23   account but not a checking.

24          (Pause)

25             MS. BEEK:  And, your Honor, may I approach the
```

```
                          HAWKINS - DIRECT                      9

 1   witness?

 2            THE COURT:  Yes, you may.

 3        (Counsel approaches the witness)

 4   BY MS. BEEK:

 5   Q    Agent Hawkins, I'm going to show you a document that's

 6   been marked just for this hearing as Exhibit 1, Petition for

 7   Warrant or Summons for Offender under Supervision.  Do you

 8   recognize that document?

 9   A    Yes, I do.

10   Q    Was that provided by the United States Probation Office in

11   California yesterday to us?

12   A    Yes.

13            MS. BEEK:  Your Honor, I'll tender a copy of that to

14   defense counsel and to the Court.

15            THE COURT:  Okay.

16        (Pause)

17   BY MS. BEEK:

18   Q    In that Exhibit 1, Agent Hawkins, are the special

19   conditions and a summary of the Defendant's case and violations

20   reflected in that document?

21   A    Yes, they are.

22   Q    And was that document issued about October 16th, 2008?

23   A    Yes.

24        (Pause)

25   //
```

```
                        HAWKINS - DIRECT                    10

 1   BY MS. BEEK:

 2   Q    While on supervised release, where did the Defendant say

 3   he and -- specifically where did he tell Judge Shubb and the

 4   United States Probation Office that he was working?

 5   A    He said he was working for a foundation called I Can in

 6   Los Angeles.

 7   Q    Is that a youth basketball league for under-privileged

 8   children?

 9   A    Yes.

10   Q    Was that true?

11   A    Not to my knowledge, no.

12   Q    And, in fact, did the Defendant in a letter that's part of

13   the public record in his case in California, it's Docket Number

14   31-3 in Case Number 2002-160, in the Eastern District of

15   California.

16        MS. BEEK:   I'll tender a copy to Defense counsel and

17   to the Court.

18   BY MS. BEEK:

19   Q    Did he write a letter to Judge Shubb saying that he had

20   been working for I Can since April of 2005?

21   A    Yes.  Yes, he did.

22   Q    And that he earns income for a box business, a gift box

23   business?

24   A    Yes.

25   Q    In reality, had the Defendant, through a girlfriend, been
```

```
                         HAWKINS - DIRECT                      11

 1   living in a house in Magnolia, Texas since about the beginning
 2   of 2006?
 3   A    Yes.
 4        (Pause)
 5   BY MS. BEEK:
 6   Q    Did the Defendant truthfully report his income and assets
 7   to the United States Probation Office?
 8   A    No.
 9   Q    Did he send in monthly supervision reports in his own
10   handwriting stating that his monthly income in 2008, for
11   example, was on the low end of $7450 to -- except for one month
12   when he said he made about $3500, about $1800 per month?
13   A    And I think that's the amount he used in his letter, too,
14   $3500 a month.
15   Q    Right.  During that 2008 period, is this the same period
16   of time that the Defendant actually took in millions of dollars
17   from investors here in the Houston area related to the Texas
18   Music Festival?
19   A    Yes, it is.
20   Q    Did he disclose the hundreds of thousands or millions of
21   dollars he was receiving from investors to the United States
22   Probation Office?
23   A    That was not disclosed to U.S. Probation, neither was his
24   involvement with the Texas Music Festival.
25   Q    Did he tell the United States Probation Office about the
```

HAWKINS - DIRECT                    12

1   bank accounts that were opened as part of the Music Festival?

2   A    No, he did not.

3   Q    Who did he use to open the bank accounts for the Music

4   Festival at Bank of America?

5   A    All the bank accounts for Festival Entertainment of Texas,

6   that was the official name of the company that was formed to

7   put on the Texas Music Festival, all those accounts were in the

8   name of Mr. Watson's son, James Watson the third.

9   Q    How old was Mr. Watson's son at the time?

10  A    In 2008, I believe he was 28 years old.

11  Q    And according to Mr. Watson's son whom you'd spoken to,

12  had Mr. Watson ever had much of a relationship with his son

13  prior to that time?

14  A    He said it was very limited.

15  Q    Did he also use the son to incorporate Festival

16  Entertainment of Texas with the Texas Secretary of State?

17  A    Yes.  Basically, everything official is in the name of the

18  son.

19  Q    Did the son say how his father approached him about this

20  Texas Music Festival and what he wanted him to do?

21  A    Yes.  He said that in late 2006 or early 2007, his father

22  approached him with the idea of putting on a music festival

23  here in Houston.  The son did say that he had mentioned to his

24  father in the past that he would like to start up his own

25  business.  And so he though his father was following up on

```
                        HAWKINS - DIRECT                       13

 1   that.
 2   Q    Where did the son work when Mr. Watson approached his son?
 3   A    He worked at Bank of America in the Premiere Client
 4   Department.  So he was a banker.
 5   Q    He was a banker.  And did he have a college degree?
 6   A    Yes.  He had a college degree.
 7   Q    From?
 8   A    Cal Berkley.
 9   Q    And later on, were the son's contacts with Bank of America
10   used to help make the check kite successful, specifically in
11   getting Bank of America to release a hold on a bad check so
12   that $400,000 could be withdrawn from Bank of America?
13   A    That's true.  Mr. Watson's son contacted a friend of his
14   that worked in his former department, which facilitated the
15   release of a portion of the $400,000 hold.
16   Q    That phone call to the friend at Bank of America from the
17   son, did the person at the bank also say that this Defendant
18   was involved in that phone conversation?
19   A    Yes.
20   Q    Did the girlfriend who was also involved with the check
21   kite tell us that she was instructed by this Defendant to send
22   what turned out to be a false receipt of ticket sales to Bank
23   of America to someone named Jessica?
24   A    Yes.
25   Q    And, in fact, was Jessica Orosco (phonetic), the person in
```

HAWKINS - DIRECT                              14

1   California that the son had called to try to convince to

2   release the hold on the bad check?

3   A    That's correct.

4   Q    And did Miss Orosco actually release the entire amount?

5   A    No.

6   Q    How much did she release out of the 400,000?

7   A    She had the authority to release $75,000.

8   Q    Is that what she did?

9   A    That's what she did.  She released $75,000.  So there was

10  still a hold of $325,000.

11  Q    Was that also released?

12  A    That was also released.

13  Q    Can you describe to the Court how that came about, that

14  the other hold on the 325 was released.

15  A    Yes.  Mr. Watson went and met with a -- a banker that he

16  had a relationship with here in Houston named Kelvin (phonetic)

17  Moon (phonetic).  And persuaded Mr. Moon to release that

18  $325,000.

19  Q    And when you say Mr. Watson, are you talking about this

20  Defendant, Mr. Watson?

21  A    Yes.  Mr. Watson, Junior.

22  Q    And based on that, and the fact that the banker in

23  California had released $75,000, did he release it?

24  A    Yes, he did.  He looked at a number of factors and decided

25  to release the money.

HAWKINS - DIRECT                    15

1   Q    When he was on supervised release from California, was the

2   Defendant required to get permission to travel?

3   A    Yes, he was.

4   Q    And did he do that?

5   A    Yes.

6   Q    Why did he tell the Probation Department that he needed to

7   travel?

8   A    He needed to travel to Houston on occasion because he was

9   starting up an I Can Foundation here in Houston.

10  Q    Again, the youth basketball league?

11  A    Yes.

12  Q    Was a travel permit granted?

13  A    Yes.

14  Q    Was the travel permit restricted in any way?

15  A    I don't know.

16  Q    Was it restricted to traveling for I Can events only?

17  A    Yes.

18       **(Pause)**

19  **BY MS. BEEK:**

20  Q    Did the Probation Department know anything about the Texas

21  Music Festival until they got a call after it was over and

22  Mr. Watson had disappeared from the music festival with money

23  from the festival?

24  A    The Probation Department did not know about Mr. Watson,

25  Junior's involvement with the Texas Music Festival until after

HAWKINS - DIRECT                                        16

1    the festival.

2    Q    In 2005, had the Defendant gone back to the Court,

3    specifically to Federal Judge Shubb, to ask that he be allowed

4    to work in the entertainment business again?

5    A    Yes, he did.

6    Q    And what was Judge Shubb's response to that?

7    A    The Judge denied that motion.

8    Q    Was there a hearing before Judge Shubb on July 27th, 2005

9    about that motion?

10   A    Yes, there was a hearing.

11   Q    And is that transcript part of the record on that case

12   that's public?

13   A    Yes.

14   Q    When the judge denied the request, did this Defendant

15   stand up and make a statement?

16   A    Yes, he did.

17        **MS. BEEK:**  I'm going to ask to approach the witness

18   again, your Honor.

19        **THE COURT:**  All right.

20        **MS. BEEK:**  This is short.

21      **(Counsel approaches the witness)**

22   **BY MS. BEEK:**

23   Q    If you'd turn to page nine of the transcript, please.

24      **(Pause)**

25   //

HAWKINS - DIRECT                    17

1   **BY MS. BEEK:**

2   Q    If you could, read the Defendant's statement starting with

3   "Because" down to the end.

4   A    Okay.

5            "Because of my criminal history, I understand that

6            the Government and the Probation Department want to

7            monitor my funds and the way I get paid.  But the way

8            the condition stands right now, is that I cannot work

9            for someone else in the industry.

10           It says I can't be associated with, directly or

11           indirectly.  So I've had offers.  In the past, I've

12           run my own operation.  Yes, that got me in trouble.

13           I'm not asking to run a company right now in the

14           entertainment business.  What I'm asking is to be

15           employed.

16           I have worldwide contacts that, with my knowledge of

17           what I can -- what I do, I can get a job that could

18           pay me half a million dollars a year, a quarter of a

19           million dollars a year because of my knowledge in the

20           field.

21           I will be paid by a company or another party to run

22           that.  That is not raising funds."

23  Q    And if you could, read the highlighted portion of Judge

24  Shubb's response.

25  A    Judge Shubb says,

HAWKINS - DIRECT                    18

1          "I want to know what you are doing.  It's highly

2          suspect to make half a million dollars' salary

3          working for someone else.  What it sounds like you

4          want to do is set someone -- somebody else up as a

5          straw man employer, and then you go about doing the

6          same kind of thing you were doing before that got you

7          into trouble.

8          And I want to take a look at whatever it is to make

9          sure that's not what you're doing."

10  Q    And is that, in fact, exactly what the Defendant did with

11  the Texas Music Festival while he was still on supervised

12  release, he used a straw man, his son, to set up a corporation

13  and a bank account to -- to commit the fraud here in Houston.

14  A    In my view, that's exactly what he did.

15       **(Pause)**

16  **BY MS. BEEK:**

17  Q    That hearing was in July of 2005.  Within approximately

18  two months of that hearing, did the Defendant solicit two

19  elderly women in Los Angeles, one of whom was 92 years old at

20  the time, to invest money with him?

21  A    Let's see, this hearing --

22  Q    It's on the front.

23  A    Yeah.  It says September 29th.

24  Q    No, that's --

25  A    Oh, no.  No.  No.  No.  I'm sorry.

```
                        HAWKINS - DIRECT                    19

 1          You're talking about the earlier hearing before Judge

 2   Shubb.

 3   Q    The earlier hearing, July 27th, 2005.

 4   A    Okay.

 5   Q    It approximately 2005 in September, according to the Los

 6   Angeles count Sheriff's Department, did the Defendant solicit,

 7   or start soliciting at that time, two elderly women to invest?

 8   A    Yes, he did.

 9   Q    And did they invest money with the Defendant?

10   A    Yes, they did.

11   Q    How much?

12   A    By the end, they had invested an amount close to $650,000.

13   Q    Did that include mortgaging their homes and giving him the

14   money?

15   A    Yes.

16   Q    Did they eventually lose their homes?

17   A    Yes.

18   Q    Was the Defendant eventually charged with elder abuse in

19   LA County related to that episode that was committed while he

20   was on federal supervised release?

21   A    He was charged.  And he pled guilty to that -- that count.

22   Q    Have you since learned that that elder abuse case is

23   actually related to this Texas Music Festival case here in

24   Houston?

25   A    Yes.
```

1   Q     And how so?

2   A     Mr. Watson told the -- the ladies that he was going to

3   invest the money in a music festival in Texas.

4   Q     Has the United States Probation Office expressed an

5   opinion about how the Defendant was able to conceal for years

6   his true residence, his employment, his income, and his assets

7   while he was on supervised release, despite close supervision,

8   including by a federal judge, who wanted to know what

9   Mr. Watson was doing?

10  A     Yes.  It was the view of the probation officers that --

11  that I spoke to, that Mr. Watson could not have gotten away

12  with what he did for those four hears without the -- the help

13  of his friends of family.  They basically refer to it was a

14  network of friends and family that -- that assisted him.

15      **(Pause)**

16  **BY MS. BEEK:**

17  Q     And covered for him whenever Probation would try to

18  inquire about what they were being told?

19  A     Yes.

20      **(Pause)**

21  **BY MS. BEEK:**

22  Q     Later on in a three page letter dated August 5th, 2008

23  that again was submitted to Judge Shubb, and I've given the

24  Court and defense counsel a copy, did the Defendant ask Judge

25  Shubb to terminate his supervision because, and I'll just

HAWKINS - DIRECT                                     21

1   summarize, the Defendant had been model probationer.  He hadn't

2   picked up any new infractions.  He'd been working with I Can

3   since April of 2005 to help ex-felons and troubled youth.  He

4   had worked with many charities, including the Boy Scouts.  But

5   the $3500 a month he said he was making from his gift box

6   business was not enough to, among other things, pay child

7   support?

8   A    Yes.

9   Q    Based on your investigation, was anything in that letter

10  true of the things that I just summarized?  Is there any

11  indication that he was working for I Can from April, 2005

12  forward?

13  A    Not that I know of.

14  Q    He mentions charities in the letter.  Did he mention a

15  charity called City Wide Club?

16  A    No.  City Wide Club is not mentioned in the letter.

17  Q    Can you tell the Judge what the City Wide Club is and how

18  it was involved in the Texas Music Festival?

19  A    The City Wide Club, it's a Houston charity.  It's run by a

20  Reverend Leroy Woodard.  One of the biggest events of the year

21  is a Thanksgiving feast in which -- I think it's held at

22  George R. Brown, but -- in which they put on a Thanksgiving

23  meal for the under-privileged.

24          And Mr. Watson has some involvement in that -- in

25  that -- that charity.  He had worked at the feast.  And also

```
                         HAWKINS - DIRECT                    22
```

 1  City Wide, he got City Wide Club involved in this -- in this

 2  fraud involving the Texas Music Festival.

 3         He represented to a -- the largest investor in the

 4  festival, a Carolyn Neehaun (phonetic), she invested

 5  approximately $900,000 in the festival, that he had advanced

 6  ticket sales of approximately $670,000 that were being held by

 7  City Wide Club.

 8  Q    And did he use stationery from the City Wide Club to

 9  convince Miss Neehaun that that was, in fact, true?

10  A    Yes.

11  Q    Okay.  And was it in fact true that there were ticket

12  sales in that amount?

13  A    That was not true.

14  Q    Okay.  And had Mr. Watson also told City Wide Club that

15  they were going to be a beneficiary of the Texas Music

16  Festival?

17  A    Yes.

18  Q    Did they ever get any money?

19  A    No.

20  Q    Did they ever hold any money for the Texas Music Festival

21  like Mr. Watson represented to investors in the festival?

22  A    No.  The City Wide Club didn't hold any money for

23  Mr. Watson or for the Texas Music Festival.

24       **(Pause)**

25  //

```
                        HAWKINS - DIRECT                    23
```

 1  **BY MS. BEEK:**

 2  Q    In late August of 2008, did Miss Neehaun, who was the

 3  largest known investor anyway in the music festival here in

 4  Houston, get a temporary injunction against the Defendant, his

 5  son, and the company, Festival Entertainment of Texas?

 6  A    Yes, she did.

 7  Q    And how did that come about?

 8  A    That came about, I believe, on August 29th, 2008, which

 9  was a Friday.  And the reason for that temporary restraining

10  order was she had an agreement with Mr. Watson and his son that

11  she had to have access to the bank accounts.

12         On that date, the password to the bank accounts was

13  changed denying her access.  So her and her attorneys went to

14  the -- went to a judge here in Harris County and got the TRO.

15  Q    And was this Defendant served with that TRO the next day

16  on August the 30th?

17  A    Yes, he was.

18  Q    The terms of the TRO include that the Defendant -- that

19  Miss Neehaun, not the Defendant, had exclusive staff control

20  over handling the money from the Music Festival in any way,

21  whether it was concessions, tickets, whatever?

22  A    Yes.

23  Q    Did the Defendant comply with the Court's temporary

24  restraining order?

25  A    No, he didn't.

|  | HAWKINS - DIRECT | 24 |
|---|---|---|

1   Q    Can you tell the Judge how the Defendant did not comply?

2   A    The Defendant continued to go to ticket vending areas in

3   the festival collecting the cash.  I've heard some of this cash

4   he put into his truck.

5   Q    Cash from concessions as well?

6   A    Well you had to buy tickets to buy concessionary goods.

7   Q    Concessions.

8   A    Yes.

9        **(Pause)**

10  **BY MS. BEEK:**

11  Q    August 29th, was that also the day that the check kite

12  occurred?

13  A    Yes.  I'd say the check kite started on August 28th and

14  ended on August 29th.

15  Q    And when was the festival supposed to have actually

16  happened?

17  A    Let's see, on Saturday, August 30th, Sunday, August 31st,

18  and Monday, September 1st, 2008.

19  Q    On that same evening, or day on August 29th, did

20  Mr. Watson's son tell us after the hold was lifted on the

21  $400,000 check, that he obtained $160,000 in cash that was put

22  in a duffle bag?

23  A    Yes.

24  Q    Did he say that was done in his father -- this Defendant's

25  instruction?

```
                              HAWKINS - DIRECT                        25
```

 1  A    Yes.

 2  Q    What did he say he did with the $160,000 in cash in the

 3  duffle bag?

 4  A    He took the -- the cash to a hotel where Mr. Watson was

 5  staying in downtown Houston, went to his hotel room, and left

 6  the money with a Marjorie (phonetic) Howell(phonetic), who was

 7  romantically linked to Mr. Watson, Junior.

 8  Q    Okay.  left it with the Defendant and Marjorie Howell?

 9       **(Pause)**

10  A    I don't remember if Mr. Watson was present at that time

11  when he left the money.

12  Q    Okay.  He you spoken to Marjorie Howell?

13  A    Yes.

14  Q    What did she say happened to the money?

15  A    She said that she spent the night in the hotel room with

16  Mr. Watson, Junior, and that the duffle bag of money remained

17  in the room during that -- that time.  And then the next

18  morning they went to the Music Festival with the money.

19  Q    Did she say they distributed some of the money for change

20  to some of the vendors?

21  A    Yes.

22  Q    And what did she say happened to the remainder of the

23  money that was not distributed?

24  A    The remainder stayed in Mr. Watson's truck.

25  Q    Did she know how much stayed in Mr. Watson's truck?

```
                        HAWKINS - DIRECT                    26

 1    A    No.

 2    Q    Did Carolyn Neehaun, the principal investor who had gotten

 3    a TRO, did she have representatives on the grounds of that

 4    festival that day and the next day --

 5    A    Yes.

 6    Q    -- to watch over the money, according to the terms of the

 7    TRO?

 8    A    Yes.

 9         (Pause)

10    BY MS. BEEK:

11    Q    What have witnesses said about what Mr. Watson was doing

12    in advance of Miss Neehaun's representatives on the grounds?

13    A    That he was going -- going to the different ticket areas

14    and collecting the cash before Miss Neehaun's people could

15    collect it.

16    Q    And where did this Defendant's son say that money was

17    placed?

18    A    In his truck.

19    Q    In this Defendant's truck?

20    A    Yes.

21    Q    Did performers actually play on the Saturday and Sunday of

22    the festival over that Labor Day weekend?

23    A    Yes.

24         (Pause)

25    //
```

1   **BY MS. BEEK:**

2   Q    Did they play on the last day, September the 1st?

3   A    No.

4   Q    What happened?

5   A    On September 1st, which was Labor Day, the performers did

6   not play, because they did not get paid.  And they subsequently

7   cancelled the Music Festival for that day.

8   Q    Prior to that, early that morning, had Mr. Watson been at

9   a hotel with the woman who had been involved with the check

10  kite?

11  A    Yes.

12  Q    Did he give her some instructions early that morning about

13  a car?

14  A    Yes.

15  Q    Tell the Court about that.

16  A    That a particular lady was holding a car for Mr. Watson,

17  a -- I think it was an old -- older Mercedes Benz.  He told her

18  to bring the car to him that morning.  And when -- after she

19  did, he got in the car and left.

20  Q    Did she ever see him again?

21  A    No.

22  Q    Did that lady tell you when you interviewed her, that

23  Mr. Watson had threatened her?

24  A    Yes.

25  Q    Can you tell the Court about the threats she says

```
                    HAWKINS - DIRECT                    28
```

1   Mr. Watson made to her related to the check kite?

2   A    Yes.  Actually, we have possibly two check kites here.  We

3   indicted Mr. Watson, Junior for one.

4          The first check kite occurred approximately 2 weeks

5   before in mid -- mid-August 2008.  Mr. Watson asked the lady

6   if -- he asked her to write out a check to him for $75,000.

7   And then he would -- and then to get on the computer and then

8   put a stop payment on it.

9   Q    Did she also work in a bank?

10  A    Yes, she did.

11  Q    What happened next?

12  A    She didn't want to write the check.  And Mr. Watson

13  threatened her at that point saying that write the check of

14  something bad is going to happen to you or your son.

15  Q    At that time was she a single mother?

16  A    Yes.

17  Q    Did he ever threaten her again?

18  A    Yes, he did.

19  Q    What did he say?

20  A    About two weeks later, the $400,000 check day, he told her

21  to write him a check for -- or write a check payable to

22  Festival Entertainment Texas for $400,000.  And then he would

23  write a check back to her, have his son write a check to her to

24  cover it.  And she refused.  And once again, he pressured her

25  by saying basically, you know, something bad will happen to you

HAWKINS - DIRECT                                    29

```
 1   or your son if you don't -- don't write me this check.
 2   Q    Now she's told you that, but she also admitted that after
 3   that she continued a sexual relationship with the Defendant; is
 4   that true?
 5   A    That's true.
 6   Q    Did any other witness that you talked to in this
 7   investigation, another investor, tell you that Mr. Watson had
 8   threatened him as well?
 9   A    Yes.
10   Q    And can you tell the Judge about that threat and how --
11   A    Yes.
12   Q    -- it came about?
13   A    An investor named Gary Parsley (phonetic), invested
14   approximately $16,000 into the Texas Music Festival.  He was
15   able to get a hold of Mr. Watson on the phone a few weeks after
16   the festival.  And about when am I going to get my money back?
17        And Mr. Watson in return told him that -- that he
18   knew some, well my language is going to be a little bit rough
19   here, your Honor.
20        THE COURT:  Go ahead.
21        THE WITNESS: Basically, I know some crazy mother
22   fuckers who may not hurt you, but will burn your house down.
23      (Pause)
24   BY MS. BEEK:
25   Q    Did one of Mr. Watson's neighbors at the house that was
```

HAWKINS - DIRECT                                30

1   bought in -- well where was that house?

2   A    It was in Magnolia.

3   Q    Okay.  And actually, have we learned that the money for

4   the down payment for that house actually came from those two

5   elderly ladies in Los Angeles?

6   A    Yes.

7   Q    Thirty-five thousand dollars?

8   A    That's right.

9   Q    That house in Magnolia, did the neighbors there actually

10  invest in the music festival with Mr. Watson?

11  A    Yes.

12  Q    What did the neighbors say about Mr. -- about the

13  Defendant's whereabouts in the days immediately following the

14  festival?

15  A    They said that approximately two days after the festival

16  they saw Mr. Watson and a, basically a caravan of cars, loaded

17  up with belongings from the house departing from the house.

18  And Mr. Watson told them as he was leaving that the festival

19  didn't go as well as he had hoped and he was going on vacation.

20  Q    Did he say he'd be back in a week?

21  A    Said he'd be back in a week.  And they never --

22  Q    Did they ever see him again?

23  A    They never saw him again.

24  Q    What did the housekeeper say about Mr. Watson in the days

25  or weeks after the Music Festival?  Did she get a call from

HAWKINS - DIRECT                                31

1   him?

2   A     Yes.   The housekeeper got a call.  And basically she kind

3   of arranged the rest of the belongings to be shipped to a

4   Roadrunner Warehouse here in Houston at Mr. Watson's direction.

5   Q     And do we now know that on September 17th Road Runner

6   actually moved the stuff out of the house into a storage

7   facility in Houston and billed Stephanie Powell, the woman who

8   had helped find the house in Magnolia, billed her for $7500,

9   which was paid in cash?

10  A     Yes.

11  Q     After Mr. Watson disappeared from the Festival, did any of

12  the investors know where he was?

13  A     No.   Other than Mr. Holden, his neighbor, seeing him maybe

14  two days later.  After that point, the investors did not know

15  where he was.

16  Q     At Mr. Watson's arraignment when he came back here to

17  Houston, did you speak to a woman who identified herself as his

18  fiancé?

19  A     Yes.

20  Q     Who was that?

21  A     Jean (phonetic) Sanders.

22  Q     And did Miss Sanders tell you where Mr. Watson was after

23  he disappeared from the Festival?

24  A     Yes.

25  Q     Before he went back to California in October?

HAWKINS - DIRECT                          32

1   A    Yes.  Miss Sanders said that Mr. Watson was with her from

2   at the time after the festival all the way up until he went

3   back to California to meet with his probation officer in late

4   October.

5   Q    And had the Defendant, even while he was on supervised

6   release when he was on supervised release when he was living in

7   Houston but pretending to live full time in Los Angeles, had he

8   made his not frequent, but regularly scheduled, appointments

9   with that probation officer to tell him he was living in Los

10  Angeles?

11  A    Yes.  I believe that's true.

12  Q    Did Miss Sanders also tell you that the stuff that had

13  been in the storage facility was now in her name in two

14  different storage facilities?

15  A    Yes.

16  Q    And this week did you execute search warrants on those

17  storage facilities here in the Houston area?

18  A    One was done last week up in Conroe.  And the other -- the

19  one was done this week here in Houston.

20  Q    Did you find any money?

21  A    No.

22       **(Pause)**

23  **BY MS. BEEK:**

24  Q    When investors been asked to invest, had they sometimes

25  been given a tour of the house in Magnolia?

HAWKINS - DIRECT                                   33

1    A    Yes.

2    Q    How did they -- or many of them describe what they saw

3    during the tour?

4    A    They described seeing a lot of gold records, you know,

5    music recording gold records.  They said there's a lot of

6    pretty fantastic memorabilia around Mr. Watson's home.  Some

7    have talked about seeing some video tapes of celebrities and

8    Mr. Watson.

9    Q    Who did he tell the investors he was as far as a music

10   promoter?

11   A    He told them he was a successful music promoter.

12   Q    Did you later learn where, according to one witness, those

13   gold records had come from?

14   A    Yes.  One of the witnesses said that Mr. Watson had

15   purchased the gold records off eBay.

16   Q    Okay.  And was this someone who had worked for Mr. Watson?

17   A    Yes.

18   Q    Did you find those in the --

19   A    No.

20   Q    -- storage shed?

21   A    Did not.

22   Q    Did you find five empty cases of Dom Perignon bottles?

23   A    Yes.

24   Q    Nineteen ninety-eight?

25   A    Nineteen ninety-eight.  Five empty cases.

HAWKINS - DIRECT                                    34

1   Q     And have you looked up the price of what a bottle of Dom

2   Paragon 1998 one bottle would cost?

3   A     One bottle would cost $2500.

4   Q     Twelve to the case, 5 cases, about $150,000?

5   A     Approximately.

6   Q     Did the neighbors report that the Defendant would show up

7   with bottles of Dom Paragon at times?

8   A     Yes.

9         **(Pause)**

10  **BY MS. BEEK:**

11  Q     After the Defendant disappeared from the festival and

12  nobody knew where he was at that time, did somebody figure out

13  at that point that the Defendant was actually on federal

14  supervised release for doing the same thing in California?

15  A     Yes.

16  Q     And who -- who was that?

17  A     Well I believe the person was the attorney that was

18  representing Carolyn Neehaun.

19  Q     And --

20  A     He later made that information known to Mr. Watson's

21  probation officer in California.

22  Q     And what happened then?

23  A     They attempted to locate Mr. Watson at -- in Los Angeles.

24  When they were unable to locate him, they termed him as having

25  absconded from his probation and a warrant was issued from his

```
                         HAWKINS - DIRECT                    35

 1    arrest.

 2    Q    Based on that Petition for Warrant that's been marked --

 3    A    Yes.

 4    Q    -- in this case, or this hearing, as Exhibit 1?

 5    A    Yes.

 6    Q    And was that on October the 16th, 2008?

 7    A    I believe that is the date.

 8    Q    From October the 16th, 2008 when the warrant was issued --

 9    well then let me ask you, by that point, too, were there

10    warrants out from the Los Angeles County Sheriff's Office

11    related to the elder abuse case?

12         (Pause)

13    BY MS. BEEK:

14    Q    At that point, Probation told you they considered him

15    absconded from supervision because they couldn't find him; is

16    that correct?

17    A    That's correct.

18    Q    And didn't know where he was.

19    A    That's correct.  We did not know where he was.

20    Q    How was he eventually apprehended?

21    A    Well he had a regularly scheduled meeting with his

22    Probation officer on October 29th, 2008.  And he showed up for

23    that meeting.

24    Q    Would the Defendant have had any way of knowing at that

25    point that there were warrants out for his arrest?
```

```
                          HAWKINS - DIRECT                  36

  1   A    Probably not.

  2   Q    As outlined in that Petition for Warrant that's marked as

  3   Exhibit 1, did the United States Probation Office consider the

  4   Defendant a flight risk and a danger to the community?

  5   A    Yes, they did.

  6        (Pause)

  7   BY MS. BEEK:

  8   Q    During your investigation -- and was he subsequently

  9   revoked and sent back to the Bureau of Prisons for violating

 10   the conditions of his supervised release?

 11   A    Yes, he was.

 12   Q    Do you remember how many months he got on the revocation?

 13   A    Oh, boy.  Got to do some math.  I thought it was 22 months

 14   though.

 15   Q    And is that set to expire this coming Monday, November the

 16   8th?

 17   A    Yes, it is.

 18   Q    And during this time that the Defendant was back in

 19   custody with the Federal Bureau of Prisons, did your

 20   investigation into the Texas Music Festival continue?

 21   A    Yes, it did.

 22   Q    Did you receive calls from at least one witness that the

 23   woman who came to the arraignment and identified herself as

 24   Mr. Watson's finance was calling and telling people not to talk

 25   to the FBI?
```

1   A   Yes.  I did talk.  I talked to a witness that did say

2   that.

3   Q   And, in fact, did she say that Jean Sanders, the self-

4   identified fiancé, had called her twice to say that.

5   A   Called her twice, but said it once.

6   Q   Okay.  Did the Los Angeles County Sheriff's Department

7   also report that one of the elderly victims had spoken to

8   Stephanie Powell, the woman who owned the house in Magnolia's,

9   ex-husband, and he reported that a woman who identified herself

10  as Mr. Watson's girlfriend was threatening him?

11  A   Made a veiled threat.

12  Q   And what was that?

13  A   The veiled threat was I know where you live, and you have

14  kids don't you?  She was basically called him in order to try

15  and get money.

16  Q   And while Mr. Watson has been in the Federal Bureau of

17  Prisons, have his phone calls been tape recorded and his emails

18  monitored?

19  A   Yes, they have been.

20  Q   Did he receive or -- and send emails to different people?

21  A   Yes, he did.

22  Q   Have you looked at those?

23  A   I've looked at some.

24  Q   Generally, what was the nature of the emails?

25  A   Well the emails that I looked at were emails to Jean

HAWKINS - DIRECT                                    38

1   Sanders, Shelly (phonetic) Myers (phonetic), and Marjorie

2   Howell.  And the nature of those emails -- Misses Howell and

3   Misses Sanders were romantically linked to Mr. Watson.  So a

4   lot of those emails are with a romantic nature.

5   Q    And we'll get back to those emails in just a minute.

6        But did the Federal Bureau of Prisons have a list

7   where they identified whose email addresses went with which

8   person?

9   A    Yes.

10  Q    Who was the email address that is

11  daddyslittlecowgirl@att.net?

12  A    That belongs to Jean Sanders.

13  Q    The same woman that we've been talking about?

14  A    Yes.

15  Q    Okay.

16       **MS. BEEK:**  If I may approach, your Honor.

17       **(Counsel approaches the witness)**

18  **BY MS. BEEK**

19  Q    Show you what's been marked as Exhibit 4.  Is that an

20  email that was sent to Mr. Watson from Jean Sanders to

21  Mr. Watson while he was in the Federal Bureau of Prisons on or

22  about May the 5th, 2010?

23  A    Yes, it is.

24  Q    Okay.  And if you could read this paragraph here.

25  A    Yes.

HAWKINS – DIRECT                    39

1          "James, I only care about you.  And if we have to go

2          underground, I will be the first in the hole looking

3          up at you to tell me what's next."

4     **(Pause)**

5  BY MS. BEEK:

6  Q    When she was at the arraignment, did Miss Sanders say that

7  Mr. Watson was going to come stay with her?

8  A    That was her hope.

9  Q    Did she also tell you that she understood he was a

10 psychopath and a criminal, but she loved him anyway.

11 A    Yes.

12     **(Pause)**

13     **MS. BEEK:**  And for the record, your Honor, we've

14 produced all of the emails we have from the Bureau of Prisons

15 to defense counsel prior to today.

16     **THE COURT:**  All right.

17     **(Pause)**

18 BY MS. BEEK:

19 Q    Based on the emails that you've seen, and phone calls

20 you've listened of Mr. Watson while he's been in the Bureau of

21 Prisons after being revoked, is he continuing to try to

22 perpetuate fraud scams from jail?

23 A    Yes.

24     **(Pause)**

25 //

```
                              HAWKINS - DIRECT                    40
```

 1  **BY MS. BEEK:**

 2  Q    Show you what I've marked as Exhibit 3.  And I'll tender a

 3  copy to the Court.  Is Exhibit 3 a document that was produced

 4  by a witness in the investigation to you?

 5  A    Yes, it is.

 6  Q    Who is that?

 7  A    Marjorie Howell.

 8  Q    Did she say that that copy of the letter, or that letter,

 9  came from the Defendant?

10  A    Yes.

11  Q    In jail?  And, in fact, it's a copy of a letter addressed

12  to the Defendant in jail, is it not?  And then it appears that

13  he's written on it.

14  A    That's correct.

15  Q    Okay.

16  A    He's --

17  Q    And what did he write on the letter addressed to him.

18  Does it look like it's from a law firm?

19  A    Yes.  It's addressed to James Watson, Junior and Lompoc

20  Federal Correctional Institute.  And it's from a Houston area

21  law firm called Galloway, Johnson, Tompkins.

22          And he's handwritten on here dated March 15th, 2010,

23          "Margie, this is the law firm that is handling the

24          revenue recovery from my rodeos 2008 to 2009 while I

25          was gone.  I should have between 437,000 to 753,000

HAWKINS - DIRECT                    41

1            coming.  I am going to make you receiver if I am not

2            able to go.  Will call you and email you soon.

3            I have to give the law firm 25 percent of the

4            settlement.  Love you, James."

5   Q    Had Miss Howell already lost money investing in the Texas

6   Music Festival?

7   A    Yes.

8   Q    What'd she lose?

9   A    I believe the money -- the dollar amount's about $200,000.

10  But she didn't have $200,000.  She took out a loan based on the

11  family -- basically the family farm in Louisiana, land that had

12  been in her family for -- for years and years.  Her and her

13  sister took out this loan and gave the money to Mr. Watson.

14  Q    Did you call that law firm to see if they represent the

15  Defendant in a settlement?

16  A    Yes, I did.  I called the law firm and asked if they

17  were -- family was familiar with Mr. Watson, Junior.  I talked

18  with an attorney at the law firm, I believe his name was Aaron

19  (phonetic) Greene (phonetic).  And he said that yes, he knew of

20  Mr. Watson.  He did not represent Mr. Watson, instead he had

21  sued Mr. Watson on behalf of another investor at the Texas

22  Music Festival that had lent Mr. Watson $150,000.

23  Q    And that letter that the Defendant sent to Miss Howell

24  saying that he was going to make her receiver out of this

25  fictitious settlement, have you also seen emails where the

HAWKINS - DIRECT                               42

 1  Defendant is trying to solicit Miss Howell to mortgage her

 2  trailer to raise bond money for him in this case?

 3  A    Yes.  Basically, you know, put her trailer up so he'd get

 4  bonded.

 5  Q    All she has left.

 6  A    If she has anything other left, I don't know about it.

 7  Q    From jail did he also tell another woman who lost money

 8  that he was going to pay her out of a settlement he says he was

 9  getting, the $80,000?

10  A    Yes.

11  Q    Tell the Court about that.

12  A    That was a email sent out to Shelly Meyers.  She's another

13  victim in this case.  I don't remember the exact amount of how

14  much money she lost, but I think it was around $160,000. or so.

15  Q    Okay.

16  A    And Mr. Watson sent her an email saying he was going to

17  get a recovery soon and would be able to pay her approximately

18  $80,000.

19  Q    During his arraignment before Judge Nancy Johnson, did the

20  Defendant, over objection from his lawyer, make a statement to

21  Judge Johnson?

22  A    Yes, he did.

23  Q    Did he make some statements about whether or not he had

24  been contacting witnesses and when he had learned about his

25  indictment on this case?

```
                      HAWKINS - DIRECT                         43
```

 1   A    Yes.  He said that he'd been blindsided by the indictment,

 2   and that he had not had any knowledge of the indictment until

 3   he had been informed of it by personnel at the jail on May

 4   27th, 2010.

 5   Q    Okay.  On having to listen to his phone calls from the

 6   jail, is that a true statement?

 7   A    No, that's false.  That's not true.

 8   Q    And how do you know that?

 9   A    Telephone call between himself and Jean Sanders on May

10   20th, 2010.  The indictment happened the day before.

11   Q    And Miss --

12   Q    And in that phone call they were talking about the

13   indictment.  He was well aware at that point.

14   Q    And he also claimed not to know anything about the

15   investigation that had been going on by the FBI for over a year

16   prior; is that correct?

17   A    That's correct.

18   Q    And the phone calls you told us from Miss Sanders to the

19   witness, that Miss Sanders told not to talk to the FBI, when

20   had that been?

21   A    Approximately a year before.

22        **MS. BEEK:**  I'll pass the witness, your Honor.

23        **THE COURT:**  All right.  Mr. Gallagher?

24        **MR. GALLAGHER:**  Thank you.

25        **(Pause)**

HAWKINS - CROSS                                    44

1                    **CROSS EXAMINATION**

2  **BY MR. GALLAGHER:**

3  Q    I'm going to first ask you about two of the -- well, I

4  guess, greater threats you had described.

5          You'd indicated that Nicole (phonetic) Hines

6  (phonetic) told you that Mr. Watson had twice threatened her?

7  A    Yes.

8  Q    And you said that they -- you said they had a romantic

9  relationship, right?

10 A    Yes.

11 Q    And what, they started dating at about June, 2008?

12 A    I don't recall the exact beginning, when they met and when

13 they got romantically involved.  But that's possible.

14 Q    And the -- the first threat you mentioned happened about

15 early August, 2008?

16 A    Yes, mid.

17 Q    And prior to that, there's been no abusive relationship,

18 right?

19 A    None that I'm aware of.

20 Q    And she told you that on this day she said she wrote a

21 check she knew there were no funds to cover, right?

22 A    Yes.

23 Q    And that she said she told you that she only did this

24 because Mr. Watson threatened her.

25 A    Yes.

HAWKINS - CROSS                                    45

1   Q    That happened -- okay, so that was early August, 2008.

2   A    Mid-August.

3   Q    Mid-August?

4   A    Yes.

5   Q    You don't have your report with you, do you?

6   A    Not the exact date, no.

7   Q    And after that, she didn't go to the police?

8   A    No, she did not go to the police at that point.

9   Q    She didn't -- she didn't even call the FBI, right?

10  A    At that point?

11  Q    Right.

12  A    Mid-August?  No.

13  Q    She didn't break up with Mr. Watson?

14  A    No.

15  Q    She continued her romantic relationship with him?

16  A    Yes.

17  Q    And she testified that there -- she wrote another check,

18  which she knew she didn't have funds to cover at the end of the

19  month, right?

20  A    Yes.

21  Q    August, 2008.

22  A    Right.  August 28th.

23  Q    Twenty-eighth.

24        And again, she told you that she only did this

25  because Mr. Watson forced her to.

```
                        HAWKINS - CROSS                    46
 1   A    Yes.

 2   Q    And after that, she didn't break up with him, right?

 3   A    No.

 4   Q    She didn't call the police.

 5   A    She did.

 6   Q    When did she call the police?

 7   A    I believe it was that next week, after the Music Festival.

 8   Q    Okay.  So in the days -- this happened on August 28th,

 9   right?

10   A    Yes.

11   Q    Okay.  So on August -- what was the first date of the

12   Festival?

13   A    August 30th.

14   Q    Okay.  So August 30th, two days after this, she went to

15   the Festival and saw Mr. Watson, right?

16   A    Yes.

17   Q    On August 31st, she went to the Festival and saw

18   Mr. Watson, right?

19   A    Yes.

20   Q    On September 2nd, she spoke to Mr. Watson about the

21   transaction, right?

22   A    Yes, I believe she spoke to him on the phone.

23   Q    And then on September 3rd, she brought him his car.

24   A    September 1st.

25   Q    September 1st she brought him his car.
```

```
                           HAWKINS - CROSS                    47
```

 1   A    Yes.

 2   Q    Okay.  And this was all -- and so it was after that -- and

 3   then you said that was the last day she saw him?

 4   A    September 1st.

 5   Q    And so it was only after she didn't see Mr. Watson that

 6   she contacted the police.

 7   A    And once the check was returned NSF.

 8   Q    Right.  And what date did that happen?

 9   A    That's either the second or the third.

10   Q    Okay.  So again after she met -- met Mr. Watson to give

11   him his car.

12   A    Yes.

13   Q    But she didn't indicate prior to the delivery of the car

14   on September 1st that she broke off their romantic

15   relationship, right?

16   A    What's that?

17   Q    She hadn't broken off their romantic relationship by --

18   A    Right.

19   Q    -- September 1st.  She continued it.

20   A    Correct.

21        **(Pause)**

22   **BY MR. GALLAGHER:**

23   Q    And Mr. -- you indicated that Mr. Parsley had also said

24   that Mr. Watson, correct?

25   A    Yes.

HAWKINS - CROSS                        48

1    Q    And this happened in September, 2008?

2    A    I believe it was September.  I don't have my notes with me

3    right now.  It's either -- it's some time after the festival

4    and before he was arrested.

5    Q    Okay.  So --

6    A    So that's either September of October.

7    Q    -- September, October, 2008.

8    A    Yes.

9    Q    You met with him to -- he told you his statement just shy

10   of a year later, right, in August, 2009?

11   A    That sounds about right.  I don't have my -- the date

12   right here.  But probably about a year later.

13   Q    Had he made any police report about this threat?

14   A    I don't know if he did.

15   Q    Okay.

16   A    He contacted our office.

17   Q    When was that?

18   A    He was one of the people that called into our office to

19   complain about Mr. Watson.  So that was either September or

20   October.

21   Q    At that time had he mentioned that he'd been threatened?

22   A    At that time, I don't remember if he mentioned that threat

23   at that time.

24   Q    It was probably about losing money at that time.

25   A    His primary concern was his money.

```
                         HAWKINS - CROSS                    49
```

 1   Q    His primary wasn't his house burning down.  His primary

 2   concern was he lost an investment right?

 3   A    I know he called us at that time.  I don't remember

 4   exactly.  But he said that was his complaint.

 5   Q    But the substance of what you testified to today that you

 6   remember clearly is from about a year later, right?

 7   A    When I talked to Mr. Parsley.

 8   Q    And he didn't see Mr. Watson after that, right?

 9   A    No.  He has not.

10   Q    And like you said, that communications was by phone.

11   A    Yes.

12   Q    I'm sorry.  Just to be clear, the communication between

13   Mr. Watson --

14   A    Between himself --

15   Q    -- and Mr. Parsley --

16   A    Yes.

17   Q    -- was by phone.

18   A    Yes, it was.

19   Q    So he didn't have any reason to think Mr. Watson would

20   come by his house, right?

21          **MS. BEEK:**  Object.  Speculation.

22          **MR. GALLAGHER:**  Well I'm asking whether Mr. Parsley

23   had told him any of this.

24          **MS. BEEK:**  Okay.

25          **THE COURT:**  I'll overrule.  You may answer.

HAWKINS - CROSS                                    50

1   **BY MR. GALLAGHER:**

2   Q    Had Mr. Parsley told you that he had any reason to believe

3   Mr. Watson or any associates would come by his house.

4   A    I don't really -- I don't quite understand the question.

5   Q    You had indicated Mr. Parsley related that Mr. Watson

6   supposedly threatened him, right?

7   A    Yes.

8   Q    With attacking his house.

9   A    Yes.

10  Q    After that threat was made, did Mr. -- did Mr. Parsley

11  relate to you that after that threat was made, he had any

12  reason to think Mr. Watson or any associates ever ridden by his

13  house.

14  A    He had any reason to believe?  Nobody burned his house

15  down.

16  A    Yes.

17      **(Pause)**

18  **BY MR. GALLAGHER:**

19  Q    And you spoke about a letter from City Wide Club.

20  A    Yes.

21  Q    And you had indicated that Mr. -- I think you used the

22  phrase, Mr. Watson had used their stationery.

23  A    I didn't use that statement.

24  Q    Okay.  Again, I just wanted -- this letter was actually

25  signed by Reverend Woodard, right?

**TRINITY TRANSCRIPTION SERVICES**

```
                        HAWKINS - CROSS                          51
```

1   A    Yes.

2   Q    Okay.  And Reverend Woodard is the head of City Wide,

3   right?

4   A    Yes, he is.

5   Q    Okay.  There was no forgery or anything, right?

6   A    I don't think there was.

7   Q    Okay.

8        **(Pause)**

9   **BY MR. GALLAGHER:**

10  Q    You had indicated, I believe, on speaking about

11  Mr. Watson's criminal history, that there was an indication of

12  fugitive status?

13  A    Yes.

14  Q    And what case is that related to?

15  A    That's -- it goes back to Roseanne (phonetic) Jenns

16  (phonetic).  That March 31st, 1994 where Mr. Watson, Junior was

17  picked up as a fugitive.  And it says ex parte proceedings.

18          So --

19  Q    Okay.

20  A    -- not a whole lot of detail here.

21  Q    You don't know of him being charged with escape?

22  A    No.  I don't know about him being charged with escape.

23  Q    Or flight.

24  A    No.  Just that he was picked up here in Houston as a

25  fugitive.  Offense was fugitive.

HAWKINS - CROSS                    52

1        **(Pause)**

2    **BY MR. GALLAGHER:**

3    Q    With the -- you described what had led to the elder abuse

4    conviction, I believe.  I just want to be clear.

5             That conviction doesn't require any physical contact,

6    right?

7    A    Fiduciary elder abuse.

8    Q    Thank you.

9        **(Pause)**

10   **BY MR. GALLAGHER:**

11   Q    You talked a little about the bank accounts, excuse me,

12   the Festival bank accounts that were involved with the 2008

13   Music Festival?

14   A    Yes.

15   Q    James Watson, the Third was the signature on those

16   accounts, right?

17   A    Yes.

18   Q    Not Mr. Watson was on any of those accounts?

19   A    He was not on any of those accounts.

20       **(Pause)**

21   **BY MR. GALLAGHER:**

22   Q    And you had -- you'd indicated that Mr. Watson was -- well

23   ultimately this term of custody he's in now came about when he

24   reported to Probation, right?

25   A    Yes.  he was arrested when he appeared at his probation

HAWKINS - CROSS                                    53

1   hearing.

2   Q     Right.

3   A     Not his hearing, meeting.

4   Q     Right.  Essentially he was arrested in the probation

5   officer's office, right?

6   A     Yes.

7   Q     There was no Marshals that had to go out and find him.

8   A     No.  He appeared at his hearing -- his meeting.

9   Q     Right.  And he'd never been charged through the period of

10  supervision with failing to make any of his appointments,

11  right?

12  A     Not that I'm aware of.

13  Q     And did you indicate you reviewed his -- or you talked

14  with the probation officer about whether he complied with his

15  conditions?

16  A     Yes.

17  Q     And one of them was that he continued to maintain

18  appointments, right?

19  A     Yes.

20  Q     And they would have -- the probation officer would have

21  verified employment, right?

22  A     Yes.

23  Q     Through the period of his supervision.

24  A     Yes.

25  Q     And he continued to file written reports through the

HAWKINS - CROSS                                    54

1    period of his supervision?

2    A     Yes, he did.

3    Q     And a number of those written reports were sent from the

4    Houston area, right?

5    A     I don't know that.

6    Q     You don't recall where they were sent from?

7    A     I don't know where they were sent from.

8          **(Pause)**

9    **BY MR. GALLAGHER:**

10   Q     You'd indicated a witness had told you about the -- where

11   Mr. Watson had obtained those gold records?

12   A     Yes.

13   Q     Who did that?

14   A     Yvette Tisdale.

15         **(Pause)**

16   **BY MR. GALLAGHER:**

17   Q     I'm sorry, you -- you said you reviewed his --

18   Mr. Watson's email -- emails during the period, I guess,

19   through this past summer when he was at Lompoc?

20   A     I reviewed, you know, a lot of his emails.  Let's see,

21   probably from, I believe it was May of this year back to

22   February maybe.  Maybe January.  But they don't keep them for

23   the whole time.  It was just like for six months.

24   Q     Right.  So you've reviewed 2010 emails, but nothing prior

25   to that.

```
                        HAWKINS - CROSS                    55

 1   A    Right.

 2   Q    Nothing older than 2010.

 3   A    Right.

 4   Q    And then you said a lot of those had to deal with

 5   relationship matters.

 6   A    Yes.

 7   Q    And a number of them had to deal with Mr. Watson making

 8   plans for his release, right?

 9   A    Yes.

10   Q    Talking about getting paperwork together.

11   A    Paperwork together?

12   Q    There are emails -- he sent emails to his correspondents,

13   asked them to get paperwork regarding where he was going to

14   live so he could prepare that to give to the BOP; is that

15   right?

16   A    He had some tasks that he'd set out for the -- for the

17   women.

18        (Pause)

19   BY MR. GALLAGHER:

20   Q    And he'd assured the plans -- the tasks involved preparing

21   to return, I think, to return to Texas, right?  To live after

22   being -- ultimately being released from BOP?

23   A    I believe he thought he was going to be released to a

24   halfway house south of Dallas.

25   Q    Right.  And absence this indictment that planning on
```

```
                        HAWKINS - CROSS                     56

 1  happening last June, right?

 2  A    Yeah.  I think so.  June of 2010.

 3  Q    So that process would -- BOP ha that process underway when

 4  this indictment intervened, correct?

 5  A    Yes.

 6  Q    Have you seen -- actually, let me ask you.  Have you seen

 7  documents related to Mr. Watson's health while in Bureau of

 8  Prisons?

 9  A    Documents, yes.

10  Q    Okay.  So you've seen the reports related to his heart

11  problems?

12  A    Yes.

13  Q    And knee problems?

14  A    Just in general.  I haven't really looked at detailed

15  medical reports.  But heart, knee, teeth.

16  Q    And teeth.

17      (Pause)

18          MR. GALLAGHER:  May I have just a moment, your Honor?

19          THE COURT:  All right.

20      (Pause)

21      (Voices whispering)

22          MR. GALLAGHER:  Thank you, your Honor.  Pass the

23  witness.

24          THE COURT:  All right.  Anything else, Miss Beek?

25          MS. BEEK:  No, your Honor.
```

HAWKINS – CROSS/ARGUMENT                    57

1              **THE COURT:** All right. All right.

2              Agent Hawkins, you may step down. Thank you, sir.

3              Government have additional witnesses?

4         **MS. BEEK:** No, your Honor. Government rest.

5         **THE COURT:** Government rests. All right.

6              Mr. Gallagher, you have witnesses to call?

7         **MR. GALLAGHER:** No, your Honor.

8         **THE COURT:** All right.

9         **MR. GALLAGHER:** Excuse me. May I have just a moment.

10        **THE COURT:** All right.

11    **(Pause)**

12    **(Voices whispering)**

13        **MR. GALLAGHER:** I'm sorry, your Honor. I don't have

14    anything.

15        **THE COURT:** All right. All right. I'll hear

16    argument. And Miss Beek?

17    **(Pause)**

18        **MS. BEEK:** Your Honor, the Defendant poses a risk of

19    flight and he is a danger to community.

20              The evidence demonstrates that he has an extensive

21    criminal history that dates back 30 years. He was on federal

22    supervised release when he committed this crime. That the

23    Defendant was previously convicted of essentially the same

24    crime, which was a bank fraud related to a music festival in

25    the Eastern District of California. And in that case, prior to

1  going to prison, the Defendant's pretrial release bond was

2  revoked because he had given false information about his

3  residence address, which he continued to do after he had served

4  his prison sentence, after he appeared in front of Judge Shubb,

5  and after he continued to send in written reports to his

6  probation officer in California, saying that he was living in

7  Los Angeles with his mother.

8        He told the Probation office that he was traveling to

9  Houston on occasion to work with this I Can group.  And as far

10 as verifying his employment, the agent's testimony from the

11 Probation Department was that there was a network of people in

12 California who covered for this Defendant so that he was able

13 to perpetuate that ruse that he wasn't living and working in

14 California, including for this group I Can.

15       Because I'll proffer to the Court that the probation

16 officer said they did call to verify employment and spoke to

17 the person identified by Mr. Watson and in writing.  And that

18 that person did vouch for him.  And that turned out to be a

19 lie.

20       They also said they were given an address.  And they

21 went back and looked and it was a vacant warehouse.

22       **MR. GALLAGHER:**  I'd object to this, your Honor.  I'm

23 sorry.  This is outside the record.

24       **THE COURT:**  Yeah.  Well just confine yourself to the

25 record, Miss Beek.

Case 2:22-cv-01554-JAM-DB Document 41 Filed 06/06/22 Page 72 of 107 PageID 9187
Case 4:10-cr-00329 Document 35 Filed on 12/09/10 in TXSD Page 62 of 68

HAWKINS - ARGUMENT                                    59

1       **MS. BEEK:** While on supervised release, the Defendant

2   not only lied about his residence, but he lied about his

3   income. He was taking in millions of dollars. And he was

4   claiming that he only had net income of anywhere from 750 to

5   $1800 a month, except for one month when he claimed $3500. He

6   claimed to be employed by I Can. He wasn't.

7       He has no job. He has no sureties. He has no

8   permanent address. He was uncooperative with Pretrial Services

9   in this case in identifying his assets.

10       The Defendant, according to not one but two

11   witnesses, has made threats against them. And witnesses have

12   said that Jean Sanders called and told them not to cooperate

13   with this investigation, and that another woman called, the

14   former girlfriend's ex-husband, Stephanie Powell's ex-husband,

15   and impliedly threatened their children, too, in trying to get

16   some money.

17       Judge Shubb was very careful, as he said, to try to

18   do everything he could to impose conditions to monitor this

19   Defendant closely. And despite the Court's best efforts, they

20   were not able to do so.

21       Even after all of that and even after a supervised

22   release on the Sacramento case was revoked, this Defendant has

23   been attempting to defraud people from jail, including to raise

24   money fraudulently because of some settlement he's supposedly

25   getting from a law firm that he says represents him that

HAWKINS - ARGUMENT                                    60

1   actually has sued him to raise bail money in this case from a

2   women that he's already taken literally the family farm from.

3          Other than this fraud, this Defendant has no

4   significant ties to Houston.  And the nature of the case is

5   concealment, your Honor, which is consistent with concealing

6   his residence that got his pretrial release bond revoked in

7   that first case back in 2002, concealment in where he lived and

8   where he work on supervised release.  And the crime itself

9   involved concealment using straws to open businesses and bank

10  accounts in their name, to conceal his involvement because he

11  had been ordered specifically by Judge Shubb who said I want to

12  know what you're doing.  You are not going to have checking

13  accounts.  And you're not going to be involved in any organized

14  entertainment event specifically, but not limited to rodeos and

15  music festivals.

16         There simply are no conditions of release that will

17  guarantee the safety of the community and that this Defendant

18  will not flee.  If he does, we will not know where to find him.

19         For that reason, we're asking that he be detained.

20         **THE COURT:**  Thank you, Miss Beek.

21         Mr. Gallagher?

22      **(Pause)**

23         **MR. GALLAGHER:**  Under -- the statute only authorizes

24  detention in this kind of case, not just to risk of others or

25  risk of other financial crimes.  It's only if there's a serious

1    risk that the person will flee, or a serious risk that the

2    person will obstruct, or attempt to obstruct, justice or

3    threaten a witness.

4           I think that admittedly there was evidence that

5    threats in this case but -- and I don't doubt that the

6    witnesses told the agent what he's, in fact, said they did.

7    But in light of the circumstances surrounding it, they're

8    suggestion that Mr. Watson threatened them are not credible in

9    this case, your Honor.

10          The one woman indicated that she -- that Mr. Watson

11   threatened her.  And she said that those happened only on

12   occasions when she was making excuses for criminal conduct that

13   she was engaged in, that is, knowingly writing checks that she

14   could not cover.

15          She continued to date Mr. Watson.  She continued to

16   help Mr. Watson.  She brought him his car after that.

17          The other gentleman called the FBI agent -- the FBI

18   to complain after the -- after talking with Mr. Watson.  But

19   the agent's testimony that his primary complaint at that time

20   was his loss of money, not any threat or burning of his house

21   down.  Which I suggest if that were truly a threat and truly it

22   happened, it would be of greater concern to someone than the

23   loss of money that there would be a arson against their house

24   if that were a credible story.

25          He told this to the agent approximately a year later

1   when they came around to continue investigating the case.

2   Mr. Watson is -- the Court has seen his criminal history.  And

3   it is absent violence.  That is not what Mr. Watson, he has no

4   history of that.  He will not present a risk to any witnesses

5   or threaten any witnesses in this matter.

6            And also flight.  He is not a risk of flight, your

7   Honor.  And they haven't shown that.  He was arrested because

8   he appeared at a Probation office regularly scheduled meeting

9   in California.  And this is after all these -- the Government

10  testified regarding very suspicious circumstances when he left

11  Houston.

12           You know, the suggestion is that he had some concern

13  that there was a problem not -- there was some concern that

14  people were going to come looking for him.

15           **THE COURT:**  What about the email that said --

16  suggested that maybe they might be going underground?

17           **MR. GALLAGHER:**  That, I mean, it's hard to read on

18  that.  I mean, that may have just as well be the staying

19  together forever, you know, through life and into death.  I

20  don't know what the circumstances of that were, your Honor.

21           But there are -- we talked about the relationship.

22  What he was going to do -- what he was planning to do in the

23  months coming up on his release were going to Bureau of

24  Prisons, going to the halfway house outside of Dallas or in

25  northern Texas, and continue his life from there.  He wasn't

HAWKINS - ARGUMENT                                       63

1   plotting to go off the grid.

2           And he has.  I mean, he's continued to, even when

3   he -- the old case in California.  I mean, he got revoked

4   there.  But again, there's no -- the Marshals didn't have to go

5   looking for him.  He went to Court when he was told.  He's

6   always done that, your Honor.  He will continue to do that now.

7           And there are people that are willing to stand as

8   sureties to Mr. Watson.  They are not in the Court.  But

9   clearly the Court can set that as a condition.  And pending

10  their approval by Pretrial, we could produce those to Pretrial

11  and have them -- have his release wait for him to be able to

12  meet that condition.

13          And similarly, regarding his whereabouts, he -- the

14  Court has -- clearly has the power to authorize that he's

15  subject to electronic monitoring, GPS monitoring, which will

16  keep the Court apprised of his whereabouts and prevent any risk

17  that he might go away.  And if there's any suspicion that he

18  becomes involved in future criminal activity, it would allow

19  the Court and the investigation to know exactly where he was at

20  different points in time.

21          The powers of this Court are great regarding bond,

22  your Honor.  And in this case and with his history, I

23  understand the concerns.  But the Court clearly can fashion

24  conditions that he would guarantee that he will come back to

25  Court and that he won't threaten or harm any other folks.

| | RULING | 64 |

1           Thank you, your Honor.

2           **THE COURT:**  Mr. Gallagher.

3           All right.  Based on the information presented at the

4    hearing this afternoon, as well as the information in the

5    Pretrial Services Report, the Court finds that the Government

6    has met its burden of establishing that this individual poses a

7    risk of flight.  I think the evidence is very strong.  And I

8    also find, based on the threats, the evidence that was

9    presented, that he does presented that he does present a danger

10   to the community.

11          So the Court will order that this Defendant be

12   detained pending the trial in this case.

13          Anything further, Miss Beek?

14          **MS. BEEK:**  No, your Honor.

15          **THE COURT:**  Mr. Gallagher?

16          **MR. GALLAGHER:**  No, your Honor.  Thank you.

17          **THE COURT:**  All right.  Court will be in recess.

18          **UNITED STATES MARSHAL:**  All rise.

19      **(This proceeding was adjourned at 3:47 p.m.)**

RULING                                              65

1                            CERTIFICATION

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6

7

8        /s/Cheryl L. Battaglia                    December 7, 2010

9            Transcriber                                Date

10   CR-H-10-329

11   11/05/10 - 12/07/10

AO386-C

**GOVERNMENT
EXHIBIT**

CASE 0:22-mj-1554-
NO.    DAB

EXHIBIT
NO.    1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. H-10-329 |
| | § | |
| JAMES WATSON, JR. | § | |

ORDER OF DETENTION PENDING TRIAL

   In accordance with the Bail Reform Act, 18 U.S.C. § 3142(f), a detention hearing has been held. I conclude that the following facts are established by a preponderance of the evidence and require the detention of the above-named defendant pending trial in this case.

Findings of Fact

[ ] A. Findings of Fact [18 U.S.C. § 3142(e), § 3142(f)(1)].

 [ ] (1) The defendant has been convicted of a (federal offense) (state or local offense that would have been a federal offense if a circumstance giving rise to federal jurisdiction had existed) that is

    [ ] a crime of violence as defined in 18 U.S.C. § 3156(a)(4).

    [ ] an offense for which the maximum sentence is life imprisonment or death.

    [ ] an offense for which a maximum term of imprisonment of ten years or more is prescribed in 21 U.S.C. ( ) § 801 et seq. ( ) § 951 et seq. ( ) § 955(a).

    [ ] a felony that was committed after the defendant had been convicted of two or more prior federal offenses described in 18 U.S.C. § 3142(f)(1) (A)-(C), or comparable state or local offenses.

 [ ] (2) The offense described in finding 1 was committed while the defendant was on release pending trial for a federal, state or local offense.

 [ ] (3) A period of not more than five years has elapsed since the (date of conviction) (release of the defendant from imprisonment) for the offense described in finding 1.

 [ ] (4) Findings Nos. 1, 2, and 3 establish a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community. I further find that the defendant has not rebutted this presumption.

[ ]   B.   Findings of Fact [18 U.S.C. § 3142(e)]

    [ ] (1)   There is probable cause to believe that the defendant has committed an offense

        [ ]   for which a maximum term of imprisonment of ten years or more is prescribed in 21 U.S.C.
( ) § 801 et seq. ( ) § 951 et seq. ( ) § 955(a).

        [ ]   under 18 U.S.C. § 924(c).

    [ ] (2)   The defendant has not rebutted the presumption established by finding 1 that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community.

[X]   C.   Findings of Fact [18 U.S.C. § 3142(f)(2)]

    [X] (1)   Defendant is accused of bank fraud and credit card fraud in violation of 18 U.S.C. §§ 1344 and 1029 and 2.

    [X] (2)   There is a serious risk that the defendant will flee.

    [ ] (3)   Defendant represents a danger to the community.

    [ ] (4)   There is a serious risk that the defendant will (obstruct or attempt to obstruct justice) (threaten, injure, or intimidate a prospective witness or juror, or attempt to do so).

[X]   D.   Findings of Fact [18 U.S.C. § 3142(c)]

    [ ] (1)   As a condition of release of the defendant, bond was set as follows:

    [ ] (2)

    [X] (3)   I find that there is no condition or combination of conditions set forth in 18 U.S.C. § 3142(c) which will reasonably assure the appearance of the defendant as required.

    [ ] (4)   I find that there is no condition or combination of conditions set forth in 18 U.S.C. § 3142(c) which will reasonably assure the safety of any other person or the community.

<u>Written Statement of Reasons for Detention</u>

I find that the accusations in the indictment and the information provided in the pretrial services report and at the detention hearing establish by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant as required.

I conclude that the following factors specified in 18 U.S.C. § 3142(g) are present and are to be taken into account:

1.  Defendant is a 54 year old U.S. citizen born in Los Angeles, California. His father is deceased, his mother lives in Los Angeles, and he has no siblings. He currently does not have a permanent address. He has been divorced 3 times, and has three children ages 31, 20, and 17. He reports employment as an entertainment promoter, but has been incarcerated for 22 months and is currently unemployed. His projected release date is November 8, 2010.

2.  Defendant has a criminal history that includes multiple convictions for writing checks with insufficient funds and grand theft, and a prior federal felony conviction for bank fraud. He has previously been held in violation of parole.

3.  Defendant has been charged with bank fraud and credit card fraud in violation of 18 U.S.C. §§ 1029 and 2, and 1344. The charges against Defendant have a potential penalty of up to 10 years in prison.

4.  Defendant has no financial ties to the community. He has no residence. He has a history of fraud and noncompliance with court orders.

5.  There is no condition or combination of conditions of release which would assure the appearance of the defendant in court. Detention is ordered.

### Directions Regarding Detention

It is therefore ORDERED that the defendant is committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the defendant to the United States Marshal for the purpose of an appearance in connection with all court proceedings.

Signed at Houston, Texas, on November 8, 2010.

Stephen Wm Smith
United States Magistrate Judge

3



**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Orlando Division**

US

vs.                                    Case No. 6: 22 CR 125 Orl-_____

James Watson, Jr

## EXHIBIT LIST

_____Government  _____ Plaintiff  ✓ Defendant  _____Court

| Exhibit No. | Date Identified | Date Admitted | Witness | Objection | Description of Exhibit |
|---|---|---|---|---|---|
| 1 | 6/3/22 | 6/3/2022 | | | Music events production Contract |
| 2 | 6/3/22 | 6/3/2022 | | | Fair grounds Cost |
| 3 | 6/3/22 | 6/3/2022 | | | Flyer for festival |
| 4 | 6/3/22 | 6/3/2022 | | | Smooth Jazz News |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |



**MUSIC EVENTS PRODUCTIONS**

June 2, 2022

Mr. Allen Cox
7931 Bronzerock Dr.
San Antonio, Texas 78244

Mr. Cox:

Due to the unfortunate cancellation of the Music Fest at South Fork Ranch that was scheduled for May 22-24, 2020, and owing to my fiduciary relationship with you, I am refunding the money you invested in this event.

Amount invested:         $180,000.00
Interest on investment:   15%
Amount of interest:       $27,000.00
Total amount of refund:  $207,000.00
Note due and payable in installments beginning August 1, 2022

- August 1, 2022      $30,000
- December 9, 2022   $30,000
- April 7, 2023        $30,000
- August 4, 2023      $30,000
- December 8, 2023   $30,000
- April 5, 2024        $30,000
- August 9, 2024      $27,000

This Note may be prepaid in whole or part at any time.

This Note may be amended or modified only by written agreement duly executed by James Watson Jr. and Allen Cox.

I trust this will satisfy the terms of our agreement and reimburse you for monies expended.

_____
James Watson, Jr.
Music Events Productions, LLC
8117 Preston Road
Dallas, TX 75225


Encl.
JW/Jeb
xc: File

U.S. District Court
Middle District of Florida

DEFENDANT EXHIBIT

Exhibit No. 1
Case No. 2 2 2 CR 128

v.

Date Identified:
Date Admitted:

**THE STATE OF GEORGIA** )
                        ) **ss.**
**COUNTY OF FULTON** )

# WITNESSETH

**Borrower: James Watson, Jr.** of Fulton, County, State of Georgia (**"The Borrower"**)

**Lender: Allen Cox** of 7931 Bronzerock Drive, San Antonio, Texas 78244 (**"The Lender"**)

**Principal Amount: $207,000 USD**

1.    **KNOW ALL MEN BY THE PRESENTS**, that this reimbursement and settlement agreement is hereby made between the **"Borrower"**, **James Watson, Jr.** and the **"Lender"**, **Allen Cox**. For the Good and Valuable Consideration of a loan issued to the said **"Borrower"** by the said **"Lender"**, in the principal sum of **$207,000 USD**, without interest payable on the unpaid principal. The **"Borrower"** promises to pay, in installments, the **"Lender"**, by whatever mode designated in writing, or verbally, to the **"Borrower"**, 20 percent (%) of the sale of his artwork and shall provide the **"Lender"** a copy of the receipt for such sale of artwork. The **"Borrower"** will provide the **"Lender"** a copy of the receipt of the sale(s) of his artwork until such time as the**"** **Borrower"** has discharged his debt to **"Lender."**

2.    The said **"Borrower"**, **James Watson, Jr.**, shall be liable for all costs, expenses, and expenditures incurred including, without limitation, the complete legal costs of the **"Lender"** incurred by enforcing this reimbursement and settlement agreement of any default by the

**"Borrower"** and such costs will be added to the principal then outstanding and shall be due and payable by the **"Borrower"** to the **"Lender"** immediately upon demand by the **"Lender."**

3.      If any term, covenant, condition, or provision of this reimbursement and settlement agreement is held by a Court of competent jurisdiction to be invalid, void, or unenforceable, it is the parties intent that such provision be reduced in scope by the Court only to the extent deemed necessary by that Court to render the provision reasonable and enforceable and the remainder of the provisions of this reimbursement and settlement agreement will be in no way affected, impaired, or invalidated as a result.

4.      This reimbursement and settlement agreement will be construed in accordance with and governed by the laws of the State of Georgia.

5.      This reimbursement and settlement agreement will inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors, and assigns of the **"Borrower"** and the **"Lender."**  The **"Borrower"** waives presentment for payment, notice of non-payment, protest, and notice of protest.

6.      This reimbursement and settlement will inure to the full credit and satisfaction of the said debt incurred by the **"Borrower"**, **James Watson, Jr.**, contingent upon receipt by the **"Lender"**, **Allen Cox,** of the full and total amount of the said indebtedness aforementioned in the amount of **$207,000 USD** and upon receipt thereof by the said **"Lender"**, **Allen Cox**, the said **"Borrower"**,

**James Watson, Jr.**, will thereby be released, discharged, and will be held harmless, from all debts and claims heretofore owed to the said **"Lender"**, **Allen Cox**.

**7.**     This agreement contains the complete, total, and entire agreement between the parties and supersedes, and replaces, any and all previously made agreements, or promises, whether oral or in writing, between the parties.   All negotiations and understandings have been included and incorporated into this agreement.  Statements or representations which may have been made by any party to this agreement which are inconsistent with this final written agreement are declared to be invalid, void, or voidable.  Only the written terms of this agreement shall bind the parties. This agreement may not be amended, supplemented, or superseded in whole or in part without the unanimous written consent of all parties hereto.

**IN WITNESS WHEREOF,** the parties hereto have duly affixed their signatures under seal and such signature shall be constituted valid and legally binding whether handwritten or in print.

**SIGNED, SEALED, AND DELIVERED**

This 16th day of  March, 2021.

*James Watson Jr*
James Watson, Jr.

**SIGNED, SEALED, AND DELIVERED**

this _____ day of _____, 2021.

_____
Allen Cox

********* Reimbursement and Settlement Agreement,  Page 3 of 3 *********

# Central Florida Fair, Inc.

License Agreement #894
must be signed and returned
with full amount no later than
September 1st 2021 or the
License Agreement shall be
null and void.

4603 W Colonial Drive.
Orlando, FL 32808
Tel: (407) 295-3247
Fax: (407) 578-2509

Rev. 06/12Final Lease Agreement.doc

## LICENSE AGREEMENT #894

THIS LICENSE AGREEMENT (hereinafter "License") made this TODAYS DATE by and between
CENTRAL FLORIDA FAIR, INC. a Florida nonprofit fair association organized under Chapter 616, Florida
Statutes, (hereinafter the "Fair") and "Licensee" as more fully described below:

LICENSEE (full legal name): **MUSIC FESTIVAL PRODUCTIONS**

TRADE/FICTITIOUS NAME (if different from legal name):

BUSINESS ADDRESS **3340 PEACHTREE ROAD NE SUITE 1800
ATLANTA, GA 30326**

TELEPHONE NO: **404 848-7795 (O) 404 848-7767 (D) 404 956-1040 JAMES**

EMAIL ADDRESS: **johng@mfprods.org**

AUTHORIZED REPRESENTATIVE(S): **JAMES WATSON JR. JOHN GRIFFIN JAMES
HILL
JOSIE FOREMAN GEORGIA ODOM**

Federal Employer Identification: **#86-2383784**

Page 1 of 15

U.S. District Court
Middle District of Florida

DEFENDANT EXHIBIT

Exhibit No. 2
22 CR 125
Case No.

v.

Date Identified:
Date Admitted:

J.W.

The Fair grants to Licensee the revocable privilege to use and occupy the following described area(s): Amphitheater and Main Field

which area(s) are outlined and defined on the attached layout of the Fairgrounds of the Fair (Exhibit "A"), subject to the terms, provisions and conditions of this License, for the sole, exclusive and specific purpose of holding and conducting:    Concert

(hereinafter "Event") and for no other purpose(s), which Event shall be held on the following dates:

FOR THE PURPOSE OF MOVE-IN use of Fairgrounds shall commence at June 27th 2022

FOR THE PURPOSE OF THE EVENT use of Fairgrounds shall commence at: June 30th – July 4th 2022

AND SHALL TERMINATE FOR THE purpose of the Event at: July 4th 2022 at 11PM;

FOR THE PURPOSE OF MOVE-OUT use of Fairgrounds shall by: July 6th 2022;

EVENT HOURS OF OPERATION (scheduled hours of operation that Fairgrounds is open to the general public); TBD;

1.      **LICENSE FEE TERMS:**  Licensee agrees to pay the Fair the sums shown on Exhibit "B" attached hereto and made a part hereof, at the times and dates stated herein.  All sums due hereunder are payable in U. S. Funds. **If Licensee fails to timely pay the sums due as provided for in Section Four of this License, Fair shall be entitled to accrual of interest on the unpaid sums due at a rate equal to the lesser of 1.5% per month, or the maximum rate permitted by law.  Notwithstanding anything herein to the contrary, the interest rate charged by Fair shall never exceed the highest interest rate allowed by law, as amended from time to time.**

**Also, and in addition to the above-mentioned sums and surcharge, Licensee agrees to pay the Fair for labor, services and/or equipment provided by the Fair at its prevailing rates in effect during the Event.**
- Promoter will receive 35% of All Beverage/Alcohol Sales and 15% of Food. PCI concessions to manage all Food/Beverage sold within the Amphitheater only.
- Promoter will utilize and sell through their own Ticket system with No Fee's required to Central Florida Fair.
- Revenue from parking will be split 50/50 after expenses.

2.      **RETURN OF LICENSE:**  This License must be executed by Licensee and returned to The Fair before 2:00 p.m. **September 21st 2021**  The failure to return the executed original License and the full deposit by said date, or, failure of the deposit check to clear, shall render this License of no force and effect.  It is understood that the License is effective only when it has been signed by the Licensee and the Fair's representatives, including the attachments of all exhibits, and the conditions, as stated in this paragraph, are fulfilled.  Licensee agrees not to advertise, promote, sell tickets, obtain sponsorships, or contract for any goods or services to be provided at the Event, or publicize the Event, until both parties have fully executed this License Agreement.  Moreover, should Licensee owe any monies, whether disputed or undisputed, to Fair from a prior License between the parties, Licensee agrees to pay all past due monies to Fair prior to the Event contracted for in this License.  In the event Licensee fails to pay any past monies due, it agrees and consents to the cancellation by the Fair of this License and the Event and waives any and all claims for damages against the Fair for said cancellation and any and all rights which might have arisen by reason of the terms of this License and Licensee shall have no recourse of any kind against the Fair.

Licensee
Initial

3. **EXHIBITS:** The use of the term "License" includes any and all exhibits and rules and regulations (collectively "Exhibits") referenced herein. The Exhibits attached to this License are:

Exhibit A - Layout of Fairgrounds and area covered by this License;
Exhibit B - Schedule of space and operational costs;
Exhibit C- Rules and Regulations;
Exhibit D - Building Policies.

4. **DEPOSIT/DEFAULT: A non-refundable / non-transferable deposit of $24,000.00 will be due on September 1st 2021 . The remaining space rental fees as outlined in Exhibit B, are due 30 days prior to MOVE-IN.** Any and all deposits paid by Licensee shall be placed in a non-interest bearing account. The Fair reserves the right at any time to require additional deposit(s) to defray anticipated charges for any and all services and/or staffing to be provided for the Event. All deposits will be credited against charges due Fair by Licensee. If the Event is cancelled, in whole or in part, for any reason, by Licensee, the Licensee shall not be entitled to a refund of any monies paid, or entitled to payment of any monies due up to and including the day of cancellation.

5. **INSURANCE:** At least thirty (30) days prior to MOVE-IN date, Licensee shall provide the Fair with a Certificate of Insurance in a form and from an insurer acceptable to the Fair, which shall name the CENTRAL FLORIDA FAIR, INC. AND THE CITY OF ORLANDO as an additional named insured for Comprehensive General Liability insurance including products and completed operations coverage with limits of not less than $1,000,000.00 ($1,000,000 if preceding space is left blank) each occurrence, combined single limit for bodily injury and property damage. The term of coverage shall coincide with the dates and time of this License including MOVE-IN and MOVE-OUT. The policy shall have a standard thirty (30) day cancellation notice provision.

Licensee shall provide to the Fair at least thirty (30) days prior to MOVE-IN Date satisfactory evidence of Workers' Compensation insurance complying with statutory requirements of the State of Florida.

Licensee shall provide the Fair with a Certificate of Insurance at least thirty (30) days prior to MOVE-IN Date as evidence of automobile liability insurance coverage on all owned, non-owned and hired vehicles used in connection with this License in an amount not less than $300,000 combined single limit per occurrence for bodily injury and property damage.

Licensee shall secure Certificates of Insurance, if applicable, at least thirty (30) days prior to MOVE-IN Date from all of its agents, exhibitors, vendors, concessionaires, contractors, sub-licensees and sub-contractors evidencing comprehensive general liability coverage insurance in form and amount no less than required for Licensee hereinabove, adding the CENTRAL FLORIDA FAIR, INC, THE CITY OF ORLANDO as an additional named insured with limits of not less than those required by Fair to be carried by Licensee.

The Fair expressly reserves the right to require Licensee to add others as additional named insureds, in its sole discretion. The Fair shall also have the sole and arbitrary discretion to require higher limits of coverage than those contained hereinabove. All insurance provided by Licensee shall designate Licensee's insurer and coverage as primary.

In the event Licensee shall not timely provide proof of insurance in the manner as set forth herein, or shall provide insurance with an insurer unacceptable to The Fair, this License shall in the sole and arbitrary discretion of Fair immediately and automatically terminate without further notice from the Fair, and the Fair shall retain the Deposit.

Licensee hereby expressly waives any and every claim which arises in its favor and against Fair for any loss or damage covered by Licensee's insurance. Such waiver shall be in addition to, and not in derogation of, any other waiver or release contained in this License with respect to any loss or damage to property, or claim of Licensee. The Licensee shall notify its insurer(s) of this waiver since it is intended to preclude the assignment of any claim by way of subrogation or otherwise.

6. **STATUS OF NAME, ADDRESS, GUARANTY:** The Licensee represents and warrants that the legal

Licensee
Initial

name as contained in the Agreement along with all other information in this License is accurate and correct in all respects and makes this warranty as of the date of this License and continuing through its duration. Licensee further represents and warrants that the Authorized Representative listed in the License has full, complete and absolute authority to bind the Licensee. If the Licensee is a Florida corporation or limited liability company, it warrants and represents that it is in good standing and active and, if it is not a Florida Corporation or limited liability company, it warrants and represents that it is authorized to do business in the State of Florida. Any change in the Licensee's legal name, fictitious or trade name, address, telephone number, or Authorized Representative, shall be forwarded to Fair, in writing, within three (3) days after the change. Should the Licensee default in the performance of any of the terms and conditions as stated herein, the Fair, at its option, may cancel this License and the relation of the parties shall be in all respects as if said term had fully expired. Should The Fair exercise its rights to cancel this License, Licensee agrees to forego any and all claims for damages against The Fair and further agrees to waive any and all rights which might arise by reason of this License and the Licensee shall have no recourse of any kind against the Fair. Furthermore, the individual executing this License on behalf of the Licensee absolutely, personally, unconditionally, and continually warrants and guarantees Licensee's full and faithful performance and payment of all obligations under this License, including indemnifying the Fair.

7.    **SERVICES PROVIDED:**  With the exception of house lighting, all facilities and fixtures of the Fairgrounds are provided to Licensee "AS IS, WHERE IS, WITH ALL FAULTS." All charges and expenses for services provided to Licensee, including, without limitation, HVAC, electric, water, natural gas, cable, CCTV, satellite and fiber optic hookups, telephone, security, trash collection and disposal, chair/table usage, LCD screens, other equipment usage, etc., shall be borne entirely by Licensee according to Exhibit "B".

8.    **STAFFING:**  The Fair shall secure and the Licensee shall pay for all staffing necessary for the Event, in accordance and must be included with Exhibit "B", including, without limitation, the staff required if hired by fair for ticket sales, ticket takers, ushers, medical personnel, security, maintenance, and parking. The Fair retains the right to determine the appropriate number of staff necessary during Events, in its sole discretion. The Fair also reserves the right, in its sole discretion, to utilize contract labor or other third parties in order to help meet the Event staffing requirements. Licensee shall not hire other personnel without the written consent of the Fair.

9.    **INDEMNIFICATION:**  Licensee hereby covenants and agrees to fully exonerate, indemnify, defend and hold harmless CENTRAL FLORIDA FAIR INC., its Board of Trustees, Directors, officers and all management, staff, agents and employees each severally and separately from any and all claims, suits, losses, damages, fines, penalties, liabilities, expenses, including reasonable attorney's fees and costs at the trial and appellate level, for any injury or death to persons (whether they be third persons or employees of either the Fair or Licensee) and any loss (through theft or otherwise) of or damage to property (whether it be that of the Fair, the Licensee or some third party), or issue of law, caused by, growing out of, or arising out of Licensee's use of the Fairgrounds, including, without limitation, its use by Licensee's agents, sub-licensees, vendors, exhibitors, contractors, sub-contractors, or concessionaires; exercise of any rights under the License; breach of any term, warranty or provision of this License by Licensee; the sale of products; the operation on the Fairgrounds, or the carelessness, negligence or improper conduct of the Fair or any other third party; or any act or omission of Licensee, its employees, officers, or agents. All such liability is hereby expressly assumed by Licensee. Such indemnification shall not apply to injury to persons or damage to property arising out of the Fair's gross negligence or willful misconduct. This provision shall expressly survive termination of this License.

10.    **NO INTEREST IN LAND:**  The parties hereto agree that Licensee's rights hereunder shall not be construed as a lease, easement, or other interest in the real property of the Fair.

11.    **RULES AND REGULATIONS:**  Licensee hereby acknowledges receipt and review of the Rules and Regulations of the Fair, as amended, which are incorporated into this License by reference and made a part hereof. The Fair reserves the right to amend its Rules and Regulations from time to time, and Licensee agrees that such amendments shall be incorporated into this License and shall be binding upon Licensee. Any amendment to the Rules and Regulations shall become effective after thirty (30) days prior written notice of any amendments has been provided to Licensee.

**LICENSEE:**

By: *James Watson Jr.*

Print Name: James Watson Jr.

Title: Chairman/CEO

Date: 8/19/21

**CENTRAL FLORIDA FAIR, INC**

By:

JONATHON P. DAY, EVENTS MANAGER

Date: 8/19/21

Reviewed and Approved by:

SHAWN KRAUEL, GM/COO

**Guarantee of Payment and Performance**

I/We the undersigned, individually/jointly and severally, do hereby fully guarantee the performance and payment of the obligations of the Licensee as set forth in this License; and do hereby agree to the terms and conditions contained in this License.

Guarantor:_____

_____
Date

Guarantor:_____

_____
Date

Licensee
Initial

**CENTRAL FLORIDA FAIR, INC.**

## Exhibit "C"

## RULES AND REGULATIONS
(03/10)

1.   **INCORPORATION INTO LICENSE:** These Rules and Regulations are incorporated into and made a part of a certain License Agreement ("License") between the CENTRAL FLORIDA FAIR, INC. ("Fair") and the Licensee named in the License Agreement.

2.   **NON-EXCLUSIVE RIGHT:** The Fair shall retain the right to use and/or license for use such portions of the Fairgrounds as may not be covered by this License. The Fair also retains the right to re-enter any part of the Fairgrounds covered by this License should such part become vacant, and to determine that such unused portion may be offered for other use with receipts therefrom going to the Fair. The Fair expressly reserves for its own use, with the privilege of occupying and using the same, all lobbies, office, spaces in hallways, corridors, concession stands, supply rooms and other areas normally reserved for the Fair's exclusive use.

3.   **CONCESSIONS:** The Fair retains the exclusive right to operate all food, beverage (alcoholic and non-alcoholic), merchandise and all other concessions during the term of the License. All monies and profit derived from the operation of said concessions shall belong to the Fair, or its agents. No other food, beverage, merchandise or other concessions are permitted on the Fairgrounds without the express written consent of the Fair, which may be arbitrarily withheld; nor shall Licensee, its agents, exhibitors or invitees be permitted to bring food and beverage on the Fairgrounds unless stated in EXHIBIT B as a Food/Beverage Buyout and signed by General Manager/Assistant General Manager.

4.   **DOOR OPENING TIME:** It is the policy of the Fair that doors will open to Licensee, its exhibitors, agents, vendors, concessionaires, contractors, sub-licensees and sub-contractors one (1) hour prior to any event, unless scheduled otherwise.

5.   **AUTOMATED TELLER MACHINES (ATM):** No ATM'S shall be allowed on Fair property except for ATM'S as provided by the Fair. Any and all revenue generated by ATM'S shall be the exclusive property of the Fair. The Fair will use its best efforts to have the ATM stocked with cash and in proper working order, however, Licensee realizes that no such guarantee exists that the ATM will be stocked or operating on any given day of the Licensee's term. Licensee agrees to forego any and all claims for damages against the Fair and further agrees to waive any and all rights or claims for damages which might arise by reason of the failure of the ATM to operate, or the failure of the ATM to be stocked with cash.

6.   **FREE SAMPLES:** No free samples of food, beverage or any other product may be given away or otherwise distributed without prior written approval of The Fair, which approval may be arbitrarily withheld in the sole discretion of the Fair. Any such permission by the Fair is subject to the insurance requirements set forth in the License.

7.   **NON-SMOKING FACILITY:** All of the buildings located on the Fairgrounds are designated as no-smoking facilities. Licensee agrees to post such signs as may be necessary to inform all persons of this fact and to enforce this rule whenever necessary.

8.   **PERFORMANCE APPROVAL:** Licensee recognizes and acknowledges the unique reputation of the Fair in the community. The Fair is dedicated to the production and presentation of wholesome, family entertainment. Licensee agrees that its Event shall be in keeping with this policy and grants to the Fair the sole and arbitrary right of approval for any performance, exhibition, exhibit, brochure, concession, novelty, merchandise, pamphlet, signage, other literature and entertainment to be offered under this License by or through License including, but not limited to, its agents, exhibitors, vendors, concessionaires, contractors, sub-licensees and sub-contractors and the Licensee agrees that no such activity or part thereof shall be given or held if objected to by the Fair, regardless of any prior contractual obligations or monies paid by Licensee for such performance, exhibition, etc.

10.  **REFUND OF TICKET REVENUE:** Licensee shall adopt and implement a policy regarding ticket refunds for cause, in keeping with the Fair's policy of retaining public faith. This shall include, but not be limited to, seats blocked by equipment when exchange for a comparable location is not possible, failure of projection equipment, failure of act or show to go on stage within a reasonable time of the advertised schedule.

11.  **CAPACITY:** Licensee shall not allow tickets, passes or any other form of admission to be sold or distributed in excess of the Fairgrounds capacity as determined by The Fire Marshall, current law and applicable City of Orlando and state law.

12.  **RIDES AND GAMES:** It is agreed that no amusement devices and amusement attractions, as those terms are defined by Chapter 616, Florida Statutes, shall be permitted to operate anywhere on the Fairgrounds. It is also agreed that there will be no games of chance or skill permitted on the Fairgrounds.

13.  **ALCOHOLIC BEVERAGES:** Licensee shall not cause or allow beer, wine or any other alcoholic beverage to be sold, given away, used or consumed upon the Fairgrounds except through Fair's authorized agent or if implemented in Exhibit B as a Beverage Buyout and signed off on by General Manager and Assistant General Manager. Licensee will be required to provide all liquor licenses and insurance requirements at least 10 days before event.

14.  **GIFTS, PRIZES, ETC.:** Licensee shall not offer any gift, prize, or item(s) for sale which the Fair may consider unacceptable for distribution, in its sole opinion, and which has not been first approved by Fair in writing.

15.  **OVERNIGHT CAMPING:** Licensee shall not cause or allow overnight camping, tent camping, sleeping or any such

Page 6 of 15

Licensee
Initial **J.W.**

act on the Fairgrounds, or in any building or any other area controlled by the Fair without the written consent of the Fair, which approval may be arbitrarily withheld in the sole discretion of the Fair. Licensee shall not allow or permit any open fires on the Fairgrounds.

16. **LOST ARTICLES:** All lost articles should be turned into the Licensee for the Event.

17. **SOLICITORS:** Absolutely no soliciting or distributing of flyers is permitted on the Fairgrounds, except as otherwise provided by law.

18. **CANCELLATION BY THE FAIR:** The Fair reserves the unilateral right to cancel this License for economic reasons, or for the public good, or for events including, but not limited to acts of God, fire, flood, natural disaster, a threat of or a tropical storm, a threat of or a hurricane, inclement weather, war or threat of war, acts or threats of terrorism, civil disorder, unauthorized strikes, governmental regulation or advisory, recognized health threats as determined by the World Health Organization, the Centers for Disease Control, or local government authority or health agencies (including but not limited to the health threats of COVID-19, H1N1, or similar infectious diseases), a pandemic, curtailment of transportation facilities, or other similar occurrence beyond the control of the parties in which case any funds paid by the Licensee for unused days, less actual expenses necessarily incurred by the Fair in connection with the Event so cancelled, will be refunded without penalty. In addition, The Fair reserves the unilateral right to cancel this License in the event of any request by any Federal, State or County agency for use of the Fairgrounds under such circumstances, it being understood and agreed by Licensee that its rights hereunder are subordinate and inferior to the right of use by any Federal, State or County agency or department, in which case any funds paid by the Licensee for unused days, less actual expense necessarily incurred by the Fair in connection with the Event so cancelled, will be refunded without penalty. Should the Fair exercise its rights to cancel this License for any reason, including but not limited to those stated above, Licensee agrees to forego any and all claims for damages against The Fair and further agrees to waive any and all rights which might arise by reason of the terms of this License and the Licensee shall have no recourse of any kind against the Fair.

19. **CANCELLATION OR DEFAULT BY LICENSEE:** Should the Licensee cancel its Event or fail to timely appear and set up for the Event or fail to perform the conditions and requirements set forth herein required to be performed prior to the MOVE-IN date of the Event, this License shall be cancelled and shall in all respects be deemed null and void, and the Fair shall retain any and all Deposits and other monies paid by Licensee as liquidated damages and not as penalty, it being understood and agreed by all parties that actual damages would be extremely difficult to ascertain. Should the Licensee default in the performance of any of the terms and conditions of this License, after the MOVE-IN date, the Fair, at its option, may cancel this License and the relation of the parties shall be in all respects as if said term had fully expired. The Fair may reenter the Fairgrounds and hold the same as of its former state therein, remove all persons therefrom, and resort to any legal proceedings to obtain such possessions. It is agreed the Licensee shall be liable for the full amount of rental fees and all operational and other charges as shown in Exhibit "B". Any Deposits or other monies paid to the Fair by Licensee or any monies collected by The Fair for admissions, parking, concessions, etc., shall, upon default after MOVE-IN, be retained by the Fair to offset any monies owed to The Fair under this License and as a result of the default of Licensee.

20. **LICENSEE'S OBLIGATION AT END OF LICENSE PERIOD:** At the end of the License Period, Licensee shall vacate the Fairgrounds and return the area and Fair's equipment to Fair, all in the same condition and repair as originally furnished to Licensee, normal wear and tear excepted. At such time, Licensee shall remove completely from the Fairgrounds all goods, wares, merchandise and property of any and all kinds and descriptions placed therein.

Licensee agrees that if the designated area, or any other part of the facilities, shall be damaged by the act, default or negligence of Licensee or of Licensee's agents, employees, vendors, concessionaires, exhibitors, contractors, sub-licensees, sub-contractors, patrons, guests or invitees, Licensee will pay to Fair upon demand such sum as shall be necessary to restore said areas to their original condition. Licensee hereby assumes full responsibility for the character, acts and conduct of all persons acting for or on behalf of Licensee.

Should Licensee not be able to vacate Fair according to the terms and conditions of this License, Licensee shall pay an extended use charge of One Thousand ($1,000.00) dollars for each hour (4) hour portion, or any part thereof, that Licensee has failed to return the facility or part thereof to Fair and vacate the facilities in accordance with the provisions of this License; unless said failure is caused by any of the following events, to the extent that such event is beyond the Licensee's reasonable control; fire, riot, earthquake, civil commotion, or Act of God. The liability to pay an extended use charge does not in any way extend the License period; is not liquidated damages; is intended as a penalty against Licensee for use of the facilities or the authorized area beyond the License period; and does not preclude Fair from asserting any other rights against Licensee, including, but not limited, those set forth herein. The extended use charge is due and payable at the end of each period for which the charge is assessed.

21. **PUBLIC SAFETY:** Licensee shall be responsible for the public safety, health and welfare of its patrons, agents, vendors, exhibitors, contractors, sub-contractors, sub-licensees, concessionaires and employees. The Fair reserves the unilateral right to cause the interruption of the Event in the interest of public safety and to likewise cause the termination of such Event when, in the sole and arbitrary judgment of any County, State or Federal agency or its agents, including but not limited to, City of Orlando Police Department, Health Department or Fire Department, such action is necessary in the interest of public safety, health and welfare. Should it become necessary to evacuate the Fairgrounds because of an act of God, natural disaster, a bomb threat or for other reasons of public safety, the Licensee will retain the privilege of using the Fairgrounds for sufficient time to complete the presentation of its Event without additional rental charge provided such time does not interfere with another License, or planned use by the Fair. If it is not possible to complete presentation of the Event, rental shall be prorated or adjusted in the sole and arbitrary discretion of the Fair based upon the situation. The Licensee hereby waives any claim for damages or compensation arising out of any action taken pursuant to this provision.

22. **OCCUPANCY INTERRUPTION:** Licensee hereby waives any and all claims for compensation for any and all loss or damage sustained by reasons of any defect, deficiency or impairment of the electrical, telephone, computer systems, LCD screens, plumbing and air conditioning installations or any part thereof furnished for the Fairgrounds granted, or by reason of any loss or impairment of light or current or water which may occur from any cause, or for any loss or damage sustained resulting from fire, black-out, brown-out,

Licensee
Initial

water, wind, civil commotion, riot, labor strikes, or act of God and the Licensee, his agent, officers, and other authorized representatives, hereby waive all rights and claims, action and causes of action and damages arising from any of the causes aforesaid.

23.     **FAIR'S RIGHT OF ENTRY:** Duly authorized representatives of the Fair, such as its Trustees, Directors, officers, employees or other agents, may enter the Fairgrounds, including the area utilized by Licensee, at anytime and occasion. Licensee hereby waives any and all claims for compensation for any and all loss or damages sustained by reasons of interference by any public agency or Fair official in the operation of the Fairgrounds; however, such interference shall not relieve Licensee from any obligations hereunder.

24.     **COMPLIANCE WITH LAWS:** Licensee shall comply and shall require its agents, exhibitors, vendors, sub-licensees, sub-contractors, concessionaires and employees to comply with all laws, ordinances and regulations adopted or established by Federal, State or Local Governmental agencies or bodies, and with the terms of this License and all rules and regulations provided by The Fair from time to time. Licensee agrees that at all times it will conduct its activities with full regard for public safety. Licensee further agrees that all portions of sidewalks, entries, floors, passages, halls, corridors, stairways and ways of access to public facilities shall be kept unobstructed and safe by Licensee and shall not be for any purpose other than ingress or egress to and from the Event and all electrical panels and doors as well as all safety/emergency exits shall not be obstructed in any way. Licensee also shall not use, store or permit to be used or stored in or on any part of Fairgrounds covered by this License any substance or thing prohibited by law, ordinance or standard policies of fire insurance companies operating or insuring in the State of Florida. No explosives and/or flammable substances including, but not limited to, pyrotechnics, illumination oils, oil lamps, candles, turpentine, benzene, naphtha, gasoline or other such substances shall be placed in or on Fairgrounds covered by this License. LP gas tanks used for cooking must be placed outside any Fair building and must be approved by the City of Orlando Fire Department. It is further agreed that no flammable materials such as bunting, tissue paper, crepe paper and any others will be permitted to be used as decorations and decorative materials unless they are treated with flame proofing and are approved by the appropriate Inspector of Orange County, Florida, before the same are installed. Licensee shall be responsible for contacting all necessary Federal, State and County agencies, including, but not limited to, the City of Orlando Fire Department, Health Department and Sheriff's Office for a fire, safety and health consultation at least two (2) weeks prior to the MOVE-IN date. A report on the meetings including the recommendation of any of the City of Orlando departments shall be provided to the Fair prior to MOVE-IN.

25.     **HAZARDOUS AND TOXIC SUBSTANCES:** The Licensee agrees, at all material times Licensee is on the Fairgrounds, not to have in its possession, collect, distribute, dispose, release or otherwise discharge any toxic or hazardous waste as defined by Florida and Federal law. In the event the Licensee shall be in possession of such hazardous or toxic waste, the Licensee shall immediately notify the Fair and the Orange County Department of Environmental Resource Management as well as the Florida Department of Environmental Protection and the Federal Environmental Protection Agency and such other governmental agency or body as may be required by law, relative to such materials. Additionally, Licensee agrees not to dispose of any refuse or empty any fluids on the Fairgrounds. In the event the Licensee or its agents, vendors, exhibitors, contractors, sub-licensees, sub-contractors, concessionaires, or employees dump grease in the Fair's sewer system, or at locations not authorized by the Fair, or shall otherwise violate the provisions of this paragraph, the Fair will look to the Licensee and shall subject the Licensee to a fine of $1,000.00 by the Fair, in addition to any governmental fine, for each infraction and Licensee shall be deemed in material breach of this License and subject to immediate cancellation of this License and removal from the Fairgrounds.

26.     **DEFACEMENT OF FACILITY/PROPERTY:** Licensee shall not injure, mar, nor, in any manner, deface the Fairgrounds or any equipment contained thereon; and shall not cause or permit anything to be done whereby the Fairgrounds property or equipment thereon shall be in any manner injured, marred or defaced; and will not drive or permit to be driven nails, hooks, tacks, staples, screws, adhesive or tape of any kind to the walls of any Fair building or equipment contained therein and will not make nor allow to be made any alterations of any kind to said buildings, property or equipment contained therein.

27.     **PAYMENT FOR DAMAGES:** Licensee agrees to pay all costs, as determined in the sole judgment of the Fair, of repair or replacement for any and all damages, or theft, of whatever origin or nature which may have occurred during the term of this License in order to restore the damaged or stolen property, personal property and equipment or other parts of the Fairgrounds affected by the Event to a condition equal to that at the time this License went into effect. Licensee specifically authorizes The Fair to deduct any damages, or expense to replace the stolen item, from the deposit (if any) referenced in paragraph five (5) of the License. Payment for repair, replacement, or damage to the premises or Fairgrounds shall be at the expense of the Licensee and shall be due within 10 days of presentment of an invoice. An invoice will be presented if the damage exceeds the Deposit, or if a deposit was not required.

28.     **ASSIGNMENT:** This License is between Fair and Licensee. Licensee may not assign this License, or any interest in the License, without the Fair's prior written consent, which consent shall be within Fair's sole discretion. Assignment shall also include a transfer or conveyance of more than fifty percent (50%) of the present ownership interest in the Licensee. Moreover, if Licensee files for bankruptcy, is declared insolvent or adjudicated bankrupt, or if Licensee makes an assignment for the benefit of creditors, if Licensee's license interest is sold under execution, or by a trustee in bankruptcy; or if a receiver is appointed for Licensee, Fair, without prejudice to its rights hereunder and at its option, without penalty, may terminate this License and take possession of the Fairgrounds immediately without notice to Licensee or any assignee, transferee, trustee, or any other person or persons, it being agreed upon that Licensee or any of the aforesaid waives any and all damages and costs it may have against Fair, if Fair exercises its rights as provided above.

29.     **UTILITY CONNECTIONS:** The Fair shall provide staff for all utility connections and Licensee, as well as its agents, exhibitors, vendors, sub-licensees, sub-contractors, concessionaires or employees shall utilize the electricity provided by the Fair. Utility connections shall include, but not be limited to, electrical, plumbing and gas. All such connections and related work shall be at the expense of Licensee, including any related costs incurred by the Fair. The Fair, at its discretion, may require meters or measuring devices on these utility connections for the purpose of establishing usage for billing Licensee. It is also agreed that Licensee will pay for all additional electrical hook-ups per Exhibit "B", including the cost of necessary permits.

30.     **UNDERGROUND UTILITIES:** Licensee shall not, nor will Licensee allow any of its agents, exhibitors, vendors, sub-licensees, sub-contractors, concessionaires or employees to drive any stake, instrument or object of any kind into the asphalt or grassy area of the Fairgrounds without the written consent of The Fair. Underground electrical wiring and fiber optic cabling is installed throughout the Fairgrounds which could result in severe electrical shock. It shall be the sole responsibility of the Licensee to enforce this

Page 8 of 15

License Initial **J.W.**

provision and The Fair will look to Licensee for reimbursement pursuant to these Rules and Regulations.

    **31.**    **CLEAN-UP:** It is agreed that the Fair will provide custodial attendants that will maintain the Fairgrounds in a clean, sanitary and safe manner from MOVE-IN through MOVE-OUT and the charges as shown on Exhibit "B" shall be paid to the Fair by Licensee. The Fair shall determine the number of attendants necessary, in its sole opinion, to clean the Fairgrounds. Upon MOVE-OUT the Fairgrounds shall be restored to a condition equal to that at the time of the MOVE-IN date.

    **32.**    **REST ROOM FACILITIES:** It is agreed that the Fair will provide bathroom attendants and supplies and the charges as shown on Exhibit "B" shall be paid to the Fair by Licensee. The Fair shall determine the number of bathroom attendants and the amount of supplies required.

    **33.**    **PARKING LOT ATTENDANTS:** It is agreed that the Fair will provide parking lot attendants if needed and the charges as shown on Exhibit "B" shall be paid to the Fair by the Licensee. The Fair shall determine the parking lot locations and the number of parking lot attendants required. No parking areas shall be used except as expressly permitted by the Fair. The Fair is a Non-exclusive parking staffing and Licensee is allowed to bring in own parking company or staff.

    **34.**    **SECURITY:** If required and implemented in Exhibit B - It is agreed that the Fair shall provide, at the Licensee's sole cost and expense, security as required by City of Orlando Police Office and the Fair in order to provide a safe environment for attendees/patrons which may include the presence of law enforcement officers as defined by Florida Statute. Licensee agrees that it shall be solely responsible for the safety and security of its own tangible personal property or tangible personal property owned by a third party but in the possession of, or utilized by Licensee, and Licensee expressly waives any claims against Fair for any loss or damage, by theft, fire, or otherwise, including the negligence of the Fair, to such tangible personal property. It is agreed that it is the responsibility of the Licensee to provide additional security, licensed, bonded and insured, as Licensee may need, at Licensee's sole cost and expense. At a minimum, security shall be required at least 1 hour before a daily Event shall begin and 1 hour after the close thereof.

    **35.**    **FIRE RESCUE/PARAMEDIC/FIRST AID:** If required and implemented in Exhibit B - It is agreed that the Fair shall provide, at the Licensee's sole cost and expense, EMS as required by City of Orlando Fire Department and the Fair in order to provide a safe environment for attendees/patrons. The Licensee, its employees, agents, exhibitors, sub-licensees, sub-contractors, vendors and concessionaires must conform to the Orange County Fire Code.

    **36.**    **GOLF CARTS:** Golf carts are permitted on the Fairgrounds by Licensee subject to the insurance requirements stated in this License.

    **37.**    **LICENSES, PERMITS AND TAXES:** Licensee agrees to obtain the proper licenses and/or permits for the use of the space covered by this License as required by Federal, State, or City of Orlando agencies pursuant to Florida law and Orange County ordinances, and supply evidence of same to the Fair on demand. Licensee agrees to promptly pay all applicable sales taxes and to require all vendors, agents, concessionaires, exhibitors, and others selling products to pay applicable taxes and carry the proper licenses and permits.

    **38.**    **OBJECTIONABLE PERSONS:** It shall be the responsibility of the Licensee to eject or cause to be ejected from the Fairgrounds any person or persons causing a disturbance and nuisance. Neither the Fair nor any of its Trustees, Directors, officers, agents or employees shall be liable to Licensee for any damages that may be sustained by Licensee through the exercise by Licensee of such action.

    **39.**    **EXHIBIT LOAD IN AND OUT:** Licensee agrees that all articles, displays, exhibits and other tangible personal property shall be brought in or out of the Fairgrounds only at such entrances and such times as designated by the Fair. All loading and unloading connected with MOVE-IN and MOVE-OUT must be directly coordinated with the Expo Services Manager of the Fair.

    **40.**    **STORAGE:** Licensee assumes all responsibility for all goods, materials, exhibits, displays, articles and other tangible personal property in or on the Fairgrounds before, during or after the Event and the Fair assumes no responsibility for said items.

    **41.**    **REMOVAL OF PROPERTY:** Licensee agrees that all property pertinent to the Event which is not a possession of the Fair shall be removed from the Fairgrounds before the expiration date of the License. The Fair shall be authorized to remove, at the expense of the Licensee, all property remaining in or on the Fairgrounds, after the MOVE-OUT date of this License. Licensee shall be responsible for payment of any and all storage costs, and Licensee agrees the Fair shall not be responsible for loss, damage or claims against property removed or stored under this provision. Licensee agrees the Fair shall have a first lien on such property for payment of costs accrued for removal and storage. In no event shall property be stored for more than three (3) months.

    **42.**    **ARTIST CONTRACT AND RIGHTS:** Licensee certifies and attests that it has a valid, properly executed and compatible contract and/or proper rights and licenses for the performance, exhibition, or show covered by the terms of this License, or occurring during the Event. Licensee shall submit to The Fair, upon demand, copies of such documents.

    **43.**    **BROADCAST RIGHTS:** The Fair reserves all rights and privileges for outgoing television, radio, web and other electronic broadcasts originating from the Fairgrounds during the term of this License, except such as the Fair may specifically grant in writing to the Licensee, or to a third party.

    **44.**    **COPYRIGHTS:** Licensee will assume all costs arising from the use of patented, trademarked, franchised or copyrighted music, materials, devices, processes or dramatic rights used at, or incorporated in the Event. Licensee agrees to indemnify, defend and hold The Fair harmless from any claims, damages, or costs, including legal fees, which might arise from use of any such material either by Licensee, or any other person or entity associated with the Event. The Fair name and logo are protected trademark/service marks and may not be used without the express written consent of The Fair.

    **45.**    **NOTICE OF SHOW REQUIREMENTS:** Licensee agrees to provide the Fair at least thirty (30) days before the MOVE-IN date of this License a full and detailed outline of all show and Event requirements whether being provided by the Fair or not.



For example, stages, tables, booth dividers, chairs, and all other information as may be required by the Fair concerning the Event covered by this License. Should the Licensee fail to provide said outline at least thirty (30) days before the first day of the MOVE-IN date of License, Licensee agrees to forgo any and all claims for damages against the Fair for failure to provide any items or personnel required for the Event, or for charges incurred by reason of the Fair providing too many or too few items or personnel for the Event, and further agrees to waive any and all rights which might arise by reason of the terms of this License.

46.     **DELIVERIES AND SHIPMENTS:** Advance shipments of goods and/or display equipment will not be accepted by the Fair. All advance shipments must be made through and coordinated with Licensee. Should the Fair accept delivery of property addressed to Licensee only as a service to Licensee, Licensee agrees to indemnify, defend and hold harmless the Fair for any loss or damage to any property in the receipt, handling, care or custody of said property at any time. The Licensee further indemnifies, defends and holds harmless the Fair from any claims or costs related to claims from any third party for loss or damage to said property on the Fairgrounds. The Fair will not accept COD or any similar delivery.

47.     **ANNOUNCEMENTS:** The Fair reserves the right to make verbal and video announcements during the Event which would relate to future attractions, events or Fair matters.

48.     **ADVERTISING:** Licensee agrees to advertise the location of the Event as the Central Florida Fair and Expositions Park. Licensee further agrees that all advertising will be honest and true and will include accurate information on the Event covered by this License. All advertising space on the Fairgrounds of the Fair is the exclusive property of The Fair and all receipts therefrom shall accrue to the Fair. No sign, picture, notice of advertisement will be posted on the Fairgrounds property by Licensee without prior written approval of the Fair as to content and location and approval by the Fair may be arbitrarily withheld in the sole discretion of The Fair. Licensee shall not advertise the Event, or any performance and/or appearance of any performer or attraction, unless and until contracts between all parties involved have been properly executed.

49.     **CIVIL RIGHTS:** Licensee agrees not to discriminate against any employee or applicant for employment because of race, religion, national origin and further agrees to likewise not discriminate for those same reasons against any person relative to admission, services or privileges offered to or enjoyed by the general public, and to be in compliance with the Federal and Florida Civil Rights Acts and the Americans with Disabilities Act (ADA).

50.     **RETENTION OF FAIR PRIVILEGES:** The waiver or failure of the Fair to insist on strict and prompt performance of the terms of this License, Rules and Regulations, Exhibits or Building Policies and the acceptance of such performance thereafter shall not constitute or be construed as a waiver or relinquishment of the Fair's right thereafter to enforce the same strictly according to the terms thereof in the event of a continuous or subsequent default on the part of Licensee.

51.     **EXCLUSIVE AGREEMENTS:** The Licensee agrees to be bound by all exclusive agreements entered into by The Fair and third parties, including, but not limited to, the agreement with re: catering and concessions, and such others as may from time to time be applicable.

52.     **OTHER CONDITIONS:** It is mutually agreed that any and all matters not expressly provided for in this License will be at the sole discretion of the Fair.

53.     **OPERATIONAL BOND:** The Fair, at its discretion, may require Licensee to deposit a security/operational bond either by cash, certified check, letter of credit, or by a duly accredited bonding company. The amount of the bond will be determined by the Fair.

54.     **CONDITIONS AND LIMITATIONS:** It is agreed that this License is subject to all the conditions and limitations set forth in all of the attachments, exhibits, rules and regulations and policies for the use of the Fairgrounds herein above referred to and Licensee shall be bound thereby. In the event of any conflict between the License and any exhibit, or attachment, the exhibit or attachment shall control. Terms and conditions of this License are not approved until this License is signed by the Chief Operating Officer of The Fair, or his designee.

55.     **NOTICES:**

(a)     **Method of Giving Notice.** All notices or other communications permitted or required to be given under this License shall be given in writing, and delivered to the Fair at 4603 W Colonial Dr Orlando, Fl 32808 and to the Licensee at the Business Address indicated on page one (1) hereof (or sent to their fax numbers) by one of the following ways, at the option of the party giving the notice: (i) by hand delivery; (ii) by certified or registered mail, return receipt requested and proper postage prepaid; (iii) by a nationally recognized overnight courier service such as FedEx; or (iv) by telecopy (fax).

(b)     **Effective Date of Notices.** Notices delivered by hand delivery or by a nationally recognized overnight courier service such as FedEx shall be effective on the date delivered to the recipient. Notices delivered by certified or registered mail shall be effective upon receipt, or three (3) business days after deposit in the United States mails, whichever shall first occur. Notices sent by telecopy shall be effective on the date transmitted and received, provided that receipt occurs before 5:00 p.m. Eastern Standard Time on a business day. If the last day for giving any notice or performing any act under this License falls on a Saturday, Sunday, or on a day on which the United States Post Office is not open, the time shall be extended to the next day that is not a Saturday, Sunday, or Post Office holiday.

56.     **COMPLAINTS:** All complaints by Licensee or its agents, including, without limitation, those relating to this License, the Fair's policies, the Fair's officers, Trustees, Directors, staff or personnel, or the Fair's other licensees, shall be dated and in writing and promptly and immediately sent to the Expo Department at the Fair office.

57.     **BUSINESS HOURS:** The normal Fair business hours are from 8:00 AM – 5:00 PM, Monday through Friday. The Fair is closed for the following holidays: New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving, and the day after, and on Christmas Eve and Christmas Day.

Page 10 of 15

License
Initial

58. **COUNTERPARTS AND DUPLICATE ORIGINALS:** To facilitate the execution of this License, any number of counterparts of this License may be executed and delivered. That is, it shall not be necessary that each party's signature appear on each counterpart, but it shall be sufficient that each party's signature appear on one or more of the counterparts. Each of the counterparts shall be considered an original and all of them, together, shall constitute one and the same instrument. Any number of duplicates of this License may be executed and delivered, each of which shall be considered an original.

59. **CONSTRUCTION OF LICENSE:** Each party has relied upon its own examination of this License and the advice of its own counsel and other advisors in connection with this License. This License was negotiated at arm's length. Thus, this License shall not be construed more strictly against the Fair notwithstanding that it has been drafted by the Fair and the Fair's counsel. Furthermore, the money, property, insurance or services which are the subject of this License are for commercial purposes and not for personal, family or household purposes.

60. **EFFECTIVE DATE:** The effective date of this License shall be the date on which the last one of the Fair's representative and the Licensee's representative executes this License.

61. **LANGUAGE:** Whenever used in this License, the singular number shall include the plural, the plural number shall include the singular, and the use of any gender shall include all genders where the context permits.

62. **PARAGRAPH HEADINGS:** The paragraph headings used in this License are for convenience only, and shall not be used in interpreting or construing any provision of this License.

63. **SEVERABILITY:** If any term, covenant, or condition of this License or the application thereof to any person or circumstance shall be to any extent held invalid or unenforceable, the remainder of this License or the application of such terms, covenants, and conditions to the persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant, or condition of this License shall be valid and enforceable to the fullest extent permitted by law.

64. **TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Handwritten or typewritten provisions inserted into this License and initialed and dated by all parties shall control over all typewritten provisions in conflict therewith.

65. **EXHIBITS:** Any exhibits attached to this License shall, by this reference, be incorporated into this License.

66. **FURTHER ACTION:** Each of the parties hereto shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of the obligations hereunder and to carry out the intent of the parties hereto.

67. **ATTORNEY'S FEES:** Any reference to attorney's fees in this License applies only to the indemnity given by Licensee to the Fair and not to any other term, provision and condition hereof.

68. **VENUE:** The venue of any legal proceeding brought in connection with this License or any aspect of the relationship between the parties shall be in Orlando, Florida.

69. **FLORIDA LAW:** This License shall be considered to have been executed in Orange County, in the State of Florida, and shall be interpreted, construed and enforced in accordance with the laws of Florida and no other.

70. **TIME:** Time is of the essence of all of the provisions and terms of this License.

71. **CONFIDENTIALITY:** Each party agrees that this License shall be deemed "confidential" and shall not disclose the contents of it unless and as provided by law or a Court of law.

72. **MATTERS SURVIVING TERMINATION:** Unless otherwise provided in this License, all of the terms, provisions, representations and warranties, and all remedies available to any party, shall survive termination of this License.

73. **SUB-LICENSEES:** All sub-licensees, sub-contractors, concessionaires, contractors, vendors or agents entering into a contract with Licensee shall take subject to the terms and conditions of this License and all such contracts shall so provide.

74. **BROKERAGE INDEMNITY:** Licensee hereby agrees to indemnify, defend and hold harmless the Fair from any claims, damages, costs and attorneys fees for brokerage, commission, finder's or other fees relative to this License and the transactions set forth herein based in any way on agreements, arrangements or understandings made by Licensee with any other party or parties.

75. **RIGHTS IN THIRD PARTIES:** Except as otherwise specifically provided, nothing expressed or implied in this License is intended, or shall be construed to confer on or give any person, firm or corporation, other than the parties and their respective officers, directors and shareholders, any rights and remedies under or by reason of this License.

76. **DEPENDENCE OF COVENANTS:** The covenants contained in this License for performance by Licensee shall be construed as dependent covenants. Default in one shall be deemed absolute whether substantial performance has occurred with regard to all or any other covenants herein.

77. **RENEWAL:** This License is only for the dates as set forth in this License. Licensee agrees that the fact that it has been granted a License in the past shall not entitle Licensee to any right to use the Fairgrounds in the future. Additionally, nothing shall prevent the Fair from granting a License to an entity which is competitive to the Licensee hereunder.

78. **RELOCATION:** The Fair, in its sole discretion, may relocate Licensee's Event to another building and/or location on the Fairgrounds.

Page 11 of 15

79. **SUCCESS:** The Licensee agrees that it is responsible for the success or failure of its Event. The fact that Licensee is restricted by and subject to the terms and conditions of this License is a risk that Licensee freely assumes.

80. **FIDUCIARY DUTY:** The parties to this License specifically intend that neither this License nor any course of dealings between them shall create fiduciary obligations. Nothing contained in this License, and no course of dealings between the parties, shall be construed as establishing a partnership, joint venture or agency between the parties. The rights, duties and obligations of the parties are to be controlled exclusively by this License. Any obligation or covenant of good faith and fair dealing, whether express, implied-in-fact or implied-in-law, is intended to be contractual only. This License was negotiated at arms' length. There is no "special relationship" between the parties. Neither party is or has been influenced or dominated by the other. Each party places in the other the trust and confidence that reasonable strangers dealing at arms' length in business relationships would place in one another. Neither party reposes special or extraordinary trust in the other. Each party to this License represents that it is an independent, experienced and sophisticated business entity or person. Each party conducts its own investigations and obtains its own information about business transactions. Each party relies wholly on its own counsel and/or judgment in making business decisions. The frequency, length, or closeness of dealings between the parties shall not create fiduciary obligations. In particular, extended dealing over a lengthy period of time shall not create fiduciary duties. Any advice given by one party to the other is offered unilaterally and accepted independently. Neither party undertakes to act for the benefit of the other, and neither accepts any trust unilaterally reposed by the other. Any disclosure obligations contained in or arising from this License or the course of dealing between the parties are strictly contractual, and do not create fiduciary obligations. The parties intend that any disclosures of information, confidential or otherwise, during the course of business negotiations or dealings shall not be construed as creating additional disclosure obligations.

81. **RELATION OF PARTIES:** It is the intention of the parties to hereby create the relationship of Licensee and Licensor, and no other relationship whatsoever is hereby created. Nothing in this License shall be construed to make the parties hereto partners or joint venturers or to render either party hereto liable for any obligation of the other.

82. **WAIVER OF JURY TRIAL:** The Fair and Licensee hereby mutually knowingly, willingly and voluntarily waive their right to a trial by jury and no party nor any assignee, successor, heir, or legal representative of the parties (all of whom are collectively referred to below as the "parties") shall seek a jury trial in any lawsuit, proceeding, counterclaim, or any other litigation or proceeding based upon or arising out of this License or any related agreement or instrument, or any course of action, course of dealing, statements (whether verbal or written) or actions relating to this License. The parties also waive any rights to consolidate any action in which a jury trial has not been waived. The provisions of this paragraph have been fully negotiated by the parties, and the parties acknowledge that the inclusion of this provision is a material inducement for entering into this License. The waiver contained in this paragraph is irrevocable, constitutes a knowing and voluntary waiver, and shall be subject to no exceptions.

83. **PRESUIT MEDIATION:** Prior to bringing any lawsuit under this License, the parties hereto agree to submit any and all disputes to pre-suit mediation under the Florida Rules for Certified and Court-Appointed Mediators and the Florida Rules of Civil Procedure 1.700-1.730 (and FRCP 1.750, excluding subsection (b)) together with the rules of the American Arbitration Association or the Foundation for Dispute Resolution. Accordingly, the parties agree to strictly follow said rules and abide by any agreement made as the result of mediation. Good faith compliance with this provision shall be a condition precedent to the right of any party hereto to bring a lawsuit under this License. This provision is a material inducement to the Fair for entering into this License.

84. **ENTIRE AGREEMENT:** All terms and conditions of this License shall be binding upon the parties, their heirs, and representatives and cannot be waived or modified by any oral representation or promise of any agent or other representative of the parties hereto unless the same be in writing and signed by the duly authorized agent or agents who executed this License. Such written document must be incorporated by specific reference therein as a part of this License. Neither party may rely on any oral representations and must look solely to the terms of this License. Furthermore, Licensee agrees that, notwithstanding the possibility of significant damages to Licensee in the event The Fair exercises its unilateral right of cancellation and termination and the right to retain the deposit and other monies, and other rights under the License and Exhibits, the Licensee agrees to the terms contained herein and executes this License voluntarily and freely. This License constitutes the entire agreement and understanding between the parties, whether oral or in writing, as to the subject matter hereof. Any and all prior agreements, understandings, and representations are hereby terminated and canceled in their entirety and are of no further force or effect. The Licensee or Licensee's representative who executes this License acknowledges that he or she understands the legal consequence and import of this clause.

**CENTRAL FLORIDA FAIR, INC.**

Exhibit "D"

**BUILDING POLICIES**
(10/01/07)

1 **GENERAL BUILDING POLICIES:**

1.1 **Decorations:** Decorations must be approved prior to being attached to any surface. No confetti or glitter is allowed. FAIR permanent graphics, signs, advertisements or displays may not be visibly blocked in any manner, nor may temporary signs or decorations be attached to permanent building graphics. Planters and furniture in public areas, galleries, rampways, etc. may not be removed or repositioned without expressed written permission from FAIR management.

1.2 **Animals:** Animals and pets are not permitted except in conjunction with an approved exhibit, display or performance legitimately requiring use of animals. Seeing-eye dogs are permitted.

1.3 **Damage:** Damage to FAIR's property or equipment shall be the responsibility of Licensee.

1.4 **Hanging of Advertising Signs:** Only FAIR personnel will be allowed to hang banners, overhead signs, and special decorations from any ceiling in the facility.

1.5 **Energy usage:** House lighting will be provided as required during open show times. Energy conservation is an important concern and minimal light and comfort levels will be maintained during MOVE-IN and MOVE-OUT periods.

1.6 **Balloons:** Helium balloons may be used for display and decoration purposes only. At no time will they be allowed to be used as a give-away item. Any balloons that come to rest on the ceiling of the facility shall be retrieved by the FAIR and the cost for such retrieval will be billed to the Licensee.

2 **SECURITY:**

2.1 Areas within the FAIR identified "Authorized Personnel or Employees Only" are restricted to FAIR personnel.

2.2 Exterior exhibit hall exit doors are not to be propped open. Automatic closing devices are not to be removed or tampered with.

2.3 Abusive language, threats, assault, vandalism, theft and all other inappropriate actions will result in the offending people being immediately removed from the premises and prosecution if appropriate.

2.4 No soliciting is permitted at the FAIR in areas not defined in the License and then only by registered exhibitors procured by Licensee who are permitted to solicit from within the confines of their booth only.

2.5 Safety of all occupants of FAIR is of utmost concern. Any and all unsafe conditions or activities will be brought to the attention of the responsible parties and corrective measures are to be made immediately.

3 **HAZARDOUS WORK AREA:**

3.1 Exhibit halls during MOVE-IN and MOVE-OUT, and service areas are considered Hazardous Work Areas.

3.2 Absolutely no drinking of alcoholic beverages.

3.3 Use or possession of illegal or controlled substances of any kind is prohibited. Violators may be prosecuted to the fullest extent of the law.

3.4 No handguns concealed or otherwise or other weapons are permitted in the FAIR.

3.5 No speeding or reckless use of vehicles or equipment will be permitted.

3.6 No gasoline, kerosene, diesel fuel or other flammable liquids may be stored, permanently or temporarily, in Hazardous Work Areas.

3.7 No re-fueling activity of any kind permitted. Re-fueling must be accomplished a minimum of fifty (50) feet beyond the exterior of the building.

3.8 Exit doors may not be blocked with freight, equipment, display material, etc.

3.9 In general, any and all unsafe condition or activity is to be corrected promptly. Safety is of primary concern in designated hazardous work area.

Licensee Initial ☒, W.

**4    PUBLIC AREAS:**  The main entrance, entrance foyer, exhibit hall entrances, rest rooms and food facilities are considered public areas and generally not under Licensee's control. As such the following guidelines apply:

  4.1    All activities utilizing public areas, such as registration, special exhibits or displays, etc. must be approved in advance. Detailed floor plans with specifications are to be submitted to FAIR not later than thirty (30) days in advance of the Event for approval.

  4.2    Activities in public areas must take into consideration the requirements of other tenants utilizing the facility.

  4.3    Service desks and related "behind the scenes" workstations should not be set in public areas.

  4.4    Cables, hoses, etc., must be covered for the safety of the public, workers, exhibitors, etc.

  4.5    Only duct tape may be used on walls and floors of FAIR.

  4.6    Licensee's service contractor must remove any tape residue left on exhibit hall floors and/or walls.

**5    LOADING DOCKS, EXHIBIT HALLS, PARKING AREA:**

  5.1    No parking in fire lanes, service lanes, vacant exhibit halls, loading dock areas or any other location posted "No Parking". This will be strictly enforced. Unauthorized vehicles may be towed or ticketed at owner's expense.

  5.2    Overnight parking on the Fairgrounds is strictly prohibited.

  5.3    A limited number of camping spaces are available on the FAIR grounds. Camping is allowed only in designated areas. All camping arrangements must be made through FAIR Security and camping fees will apply. No open fires are permitted and no camping in tents is allowed.

  5.4    Show management and other VIP parking may be arranged through FAIR.

  5.5    No vehicles of any type will be allowed inside of the buildings.

  5.6    Crate storage is not permitted in exhibit halls or interior building areas under any circumstances. Refer to fire regulations for specific crate storage information.

  5.7    Only FAIR personnel will operate any overhead door.

  5.8    FAIR serves as its own electrical and utility contractor. Refer to separate rate and service schedules for details.

  5.9    All items to be suspended from exhibit hall ceilings, including signs, displays, light and sound equipment, etc., must be approved in advance by FAIR and hung by FAIR personnel. Additional charges will apply.

  5.10   Rigging of cable and other hanging devices on or near ceiling, electrical buss ducts and conduits are to be done only by FAIR authorized personnel.

  5.11   All ceiling equipment, material, and rigging must be removed immediately upon close of the show.

  5.12   Clear access is to be maintained to exhibit hall concession stands and restrooms at all times.

  5.13   Licensees and their service contractors are responsible for removal of bulk trash, pallets, packing material, lumber, etc., prior to show opening and following MOVE-OUT.

  5.14   FAIR shall arrange for trash hauls of show trash, but cost shall be the responsibility of Licensee.

**6    BASIC FIRE CODE REGULATIONS:**

  6.1    Show management, exhibitors, service contractors, and all other involved parties must comply with all federal, state, and municipal fire codes which apply to places of public assembly.

  6.2    Fire fighting and emergency equipment may not be hidden or obstructed, including fire extinguishers, fire hose cabinets, and fire alarm pull stations.

  6.3    Crate storage is the responsibility of the appropriate service contractor of Licensee. Crates, wooden boxes, packing material, or show equipment etc. may not be stored in exhibit halls, meeting rooms, exit or service areas. Under no circumstances will crate storage or equipment storage be permitted to obstruct emergency exits from any area of the building. This requirement will be strictly enforced! Crated storage is considered a potentially hazardous situation and service contractors should submit all crate storage plans to FAIR for approval.

  6.4    Vehicles with gasoline engines may be displayed with approval of the FAIR and/or Fire Marshal. General rules: A maximum of two (2) gallons of gas in the tank. A locking gas cap must be installed or the tank must be adequately sealed by tape or in some other appropriate manner. All battery cables must be disconnected and taped to avoid potential sparks.

  6.5    All electrical equipment must be UL approved and all gasoline engines must be AGA approved.

  6.6    All emergency exits, hallways, and aisles leading from the building are to be kept clear and unobstructed. Vehicles in fire lanes or blocking exits, etc., will be removed at owner's expense.

**7    MISCELLANEOUS:**

  7.1    FAIR management reserves the right to modify or change these policies as it deems necessary.

Licensee Initial ~, W.









**2022 Orlando Music Festival - 3 Day General Admission Pass**

Central Florida Fairgrounds
July 1st-3rd, 2022
Gates open 2:00pm, Show starts 4:00pm

3 Day Pass - General Admission    $0.00

Section: General Admission   Row:   Seat:



**2022 OMF 3 DAY GA**
Central Florida Fairgrounds
Friday, 7/1/2022 at 4:00 PM

**3 Day Pass - General Admission -**
SECTION          ROW   SEAT
GA

www.2022omf.com

---

**FEATURING THE**

## ULTIMATE NAMES

### IN SMOOTH JAZZ AND R&B

**THURSDAY JUNE 30TH**
**PRE-FESTIVAL ALL WHITE GALA**
Pieces of a Dream
Marion Meadows
Jazmin Ghent
Leon Pressley
Deborah Krantz

**FRIDAY JULY 1ST**
Brian Culbertson
David Sanborn
Rick Braun
Richard Elliot
Vincent Ingala
LeoNell Teape

**SATURDAY JULY 2ND**
Boney James
Peter White
Euge Groove
Nathan Mitchell
Lindsey Webster
Adam Hawley
Jones High School Alumni Band

**SUNDAY JULY 3RD**
The Jacksons
Ray Parker Jr.
Eric Darius
Spyro Gyra
Deborah Krantz
Leon Pressley

---



MUSIC FESTIVAL PRODUCTIONS



**4TH OF JULY WEEKEND**

FRIDAY



U.S. District Court
Middle District of Florida

DEFENDANT EXHIBIT

Exhibit No.   3

Case No.   22 CF 125

v.

Date Identified:
Date Admitted:



## THURSDAY JUNE 30TH

**Pre-Festival All White Gala
General Admission**

**1 ticket / $100** *parking included*

A portion of the proceeds from the Pre-Festival
All White Gala will benefit the American Cancer Society

## GENERAL ADMISSION

**1 Day / 1 Ticket $65 per day
($90 at gate)**

**3-Day Festival Pass / $150**

## PLATINUM SEATING

**1 Day / 1 Ticket $225**

Reserved Section, Unreserved Seating,
Lawn Chairs Allowed, Shade Pavillion,
Parking, 2 Drinks

## PLATINUM SEATING

**4 Days / 2 Tickets $700**

Reserved Section, Unreserved Seating,
Lawn Chairs Allowed, Shade Pavillion,
Parking, 6 Drinks (per ticket)

*Pre-Festival All White Gala (June 30th)
*Food and drinks not included*

## DIAMOND TABLE

**4 Days / 2 Tickets $1,200**

Reserved Seating, Complementary Drinks,
Diamond Lounge, Special Backstage
Entrance, Special Parking

*Pre-Festival All White Gala (June 30th)
*Food not included*

**FEATURING THE
ULTIMATE NAMES
IN SMOOTH JAZZ AND R&B**

**CENTRAL FLORIDA
FAIRGROUNDS   ORLANDO, FL
JULY 1-3, 2022**

ORLANDO
20 22
MUSIC FESTIVAL





**JULY 1-3 2022** FEATURING **THE ULTIM**
**CENTRAL FLORIDA**
TICKETS ON SALE



U.S. District Court
Middle District of Florida

DEFENDANT EXHIBIT

Exhibit No.                4
Case No.          22 CR 115

v.


Date Identified:
Date Admitted:







# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                                    **CASE NO: 6:22-mj-1515-DAB**

**JAMES WALKER WATSON, JR.**

_____

## FINDINGS AND ORDER ON REMOVAL PROCEEDINGS
## PURSUANT TO RULE 5(c), FED.R.CRIM.P.

James Walker Watson, Jr., having been arrested and presented before me for removal proceedings pursuant to Rule 5(c), Federal Rules of Criminal Procedure, and having been informed of the rights specified in Rule 5(d) thereof, and of the provisions of Rule 20, the following has occurred of record.

An Initial Appearance on the Rule 5(c) Indictment from Eastern District of Texas was held on May 31, 2022.

Based on the defendant's waiver of identity hearing, I find that JAMES WALKER WATSON, JR. is the person named in the warrant for arrest, a copy of which has been produced.

It is, therefore,

**ORDERED** that JAMES WALKER WATSON, JR. be held to answer in the district court in which the prosecution is pending.   Final Commitment given to the U.S. Marshal.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on June 6, 2022 .

_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

United States Marshal
Counsel of Record